UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

CHARLES GREGOIRE DE ROTHSCHILD,

Plaintiff,

-against-

JORDAN D. SERLIN,

Defendant.

---------------------------------------------------------------x

Index No. 1:19-cv- 11439

**COMPLAINT**

Jury Trial Demanded

Venue based on case arising from a federal question and diversity

Charles Gregoire de Rothschild (herein referred to as "CG de Rothschild" or "Plaintiff"), by and through his attorneys, Leonard Zack & Associates, for his Verified Complaint against Defendant, Jordan D. Serlin ("Serlin" or "Defendant") hereby respectfully alleges, on knowledge as to his own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1. Prior to June 10, 2010, CG de Rothschild was a highly-regarded executive in the field of banking. He was happy with his work, respected by his peers, and on path of advancement in his multiple businesses, including GDR Privée. In short, each of CG de Rothschild's businesses were trusted among his community to result in prosperous funds.

2. Meanwhile, Serlin was unknown in the field of banking and was searching for a skilled and seasoned executive to lead his company, Conundrum Capital LLC ("Conundrum"). Conundrum was created on or about April 14, 2010 in Boca Raton, Florida. The Articles of Organization of Conundrum are attached hereto as Exhibit A.

3. When Serlin met CG de Rothschild, Serlin was very impressed. Serlin liked CG de Rothschild's skill set. Serlin wanted CG de Rothschild's knowledge and experience. Serlin

valued CG de Rothschild's connections. At no point did CG de Rothschild ever represent to Serlin to be affiliated with the infamous Rothschild banking family.

4. The key to persuading CG de Rothschild to come aboard and help Serlin with Conundrum was compensation. Once the dialogue started, CG de Rothschild made it clear that, however much Serlin's job offer intrigued him and he saw Serlin as his apprentice, CG de Rothschild required an compensation package that would make it worthwhile for CG de Rothschild to invest his time, money, connections, and reputation into Conundrum.

5. Serlin did what it took to win over CG de Rothschild, except Serlin was playing by his own rules. On or about June 10, 2010, Serlin presented CG de Rothschild with Conundrum's Operating Agreement adding in GDR Privée, as represented by CG de Rothschild, as a one-third (1/3) equity member ("Operating Agreement"), attached hereto as Exhibit B.

6. Serlin's wrongdoing did not stop at fraudulently inducing CG de Rothschild to work at Conundrum. After CG de Rothschild joined Conundrum, Serlin never abided by the Operating Agreement.

7. While at Conundrum, CG de Rothschild brought in many investors and traders, including Stephen Serlin ("Stephen"), Serlin's late father. Stephen never invested with Defendant prior to Defendant working with CG de Rothschild. These investors trusted their money with Conundrum solely due to CG de Rothschild's presence and reputation.

8. When CG de Rothschild realized the investors were pouring in because of his stature, he demanded a greater role and share of Conundrum's profits. Serlin recognized the importance of keeping CG de Rothschild at Conundrum and agreed to raise his ownership of Conundrum from one-third (1/3) to forty-nine percent (49%), but to share profits equally with Serlin at fifty percent (50%) each. These are documented in the first amendment to the Operating

Agreement ("Amendment #1"), dated September 21, 2010 and attached hereto as Exhibit C. Amendment #1 also states that any "major, extraordinary or unusual decision must be approved in writing by both parties." It also explicitly states that CG de Rothschild, represented through GDR Privée, and Serlin are the two and only two parties being referred to.

9. As a further assurance to CG de Rothschild that he was a valued a member of Conundrum, and to reap the benefits of the monies procured from third-party investors by CG de Rothschild's role and reputation, Serlin agreed that he would inform CG de Rothschild, in writing, in advance, of any non-standard expenses in excess of One Thousand U.S. Dollars ($1,000), and that he would not incur such an expense until CG de Rothschild responded, in writing, with an understanding of the expense being justified. This is documented in the second amendment to the Operating Agreement ("Amendment #2"), dated March 29, 2011 and attached hereto as Exhibit D.

10. However, the Operating Agreement, Amendment #1, and Amendment #2 (collectively and individually referred to as "Agreement") were deliberate lies. As Serlin made clear through his subsequent behavior and prevarications, Serlin never intended to provide CG de Rothschild *any* compensation and intended to solely benefit from Conundrum.

11. By the end of 2010, CG de Rothschild brought in a total initial investment of or about **Fifty Million One Hundred Thirty Four Thousand U.S. Dollars ($50,134,000)** into Conundrum. Of this initial investment, CG de Rothschild invested Fifty Thousand U.S. Dollars ($50,000) of his own money, Stephen invested Fifty Million U.S. Dollars ($50,000,000), and Defendant invested Zero U.S. Dollars ($0) into Conundrum.

12. By the end of 2011, due to CG de Rothschild's sole industry knowledge, connection, and consulting services, Conundrum prospered and their initial investment of Fifty

Million One Hundred Thirty Four Thousand U.S. Dollars ($50,134,000) grew to over **One Hundred Seventy Seven Million U.S. Dollars ($177,000,000+)** in capital.

13. As per the terms of the Agreement, Serlin and CG de Rothschild would share a quarter of half of Conundrum's profits, equaling twelve and one-half percent (12.5%) of fifty percent (50%) of Conundrum's profits. Thus, CG de Rothschild was entitled to an amount equal to or around **Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500)**. However, CG de Rothschild never received any share of proceeds.

14. When CG de Rothschild began asking for his rightful share of the proceeds, Serlin began plotting to completely cut CG de Rothschild out for good so that Serlin would not have to pay CG de Rothschild his fair share of Conundrum's profits.

15. In 2012, Serlin created Eagle International LLC ("Eagle") without CG de Rothschild's knowledge. Serlin used the monies gained from Conundrum to open Eagle. In February 2012, Serlin closed Conundrum's bank accounts and dissolved Conundrum without CG de Rothschild's knowledge or approval. Please see Exhibit F for Conundrum's Article of Dissolution showing only Serlin's e-signature closing Conundrum. The Agreement required both Serlin and CG de Rothschild to agree in writing prior to any "major, extraordinary or unusual decision," however, Serlin breached this agreement when he did not obtain CG de Rothschild's written consent to dissolve Conundrum, clearly a major, extraordinary or unusual decision.

16. CG de Rothschild believed Serlin to be his student and did not think Serlin was capable – both mentally and physically – of wronging CG de Rothschild out of millions of dollars. CG de Rothschild believed Serlin to be an innocent naïve individual new to the realm of finance and trading. CG de Rothschild was in denial about Serlin's true nature.

17. Also in February 2012, Serlin falsely reported to the New York City Police Department ("NYPD") that Mr. Rothschid was involved in an aggravated harassment. Serlin lied to the NYPD stating that that while doing business with his partner, CG de Rothschild, in New York, CG de Rothschild wrote Serlin an email declaring, "You [will be] held responsible personally for all the consequences according the laws, including penalties according [to the] tax code. I will take everything from you. You [will] pay with your blood." Please see Exhibit E for a copy of the police report quoting the same from an interview with Serlin.

18. Serlin exhausted NYPD's resources on this false claim. On May 2, 2012 at 11:10 a.m., four months into the investigation, NYPD subpoenaed CG de Rothschild's personal and corporate email messages. Five minutes later at 11:15 a.m., the case was marked as closed because it was clear CG de Rothschild did not do any of the alleged claims. Please refer back to Exhibit E. Moreover, it was in fact, Serlin that inserted those words in CG de Rothschild's email when forwarding or replying the email to another party.

19. Serlin had hoped the NYPD would find CG de Rothschild to be guilty of the crime with the doctored email and that CG de Rothschild would be facing legal troubles and no longer able to receive his entitled funds from Conundrum. When the outcome of the NYPD false report situation did not resolve as Serlin hoped it would, Serlin took more desperate measures.

20. However, while the false report to the NYPD did not result in CG de Rothschild's arrest, as Serlin had hoped, news of the investigation had broken out and CG de Rothschild began experiencing a loss of reputation.

21. In 2013, Serlin started telling colleagues that CG de Rothschild was being investigated by the Federal Bureau of Investigation ("FBI"). This was wholly untrue, however, such a rumor after news spread of the NYPD investigation further harmed CG de Rothschild's

reputation. It became public knowledge that CG de Rothschild was having problems with his business partner, and CG de Rothschild was deemed difficult to work with, to have a dishonest character personally and in business, and to skirt the law in his operation of business.

22. After learning of Conundrum's closure, CG de Rothschild began asking the traders, investors, and anyone that had he had worked with and Serlin to see if anyone had any knowledge about what had happened with Conundrum's monies.

23. Serlin would avoid any conversation with CG de Rothschild or agent of CG de Rothschild and had turned so much of their mutual connections against CG de Rothschild that CG de Rothschild was unable to learn what happened with Conundrum's monies for years.

24. It was not until November 2013 when CG de Rothschild obtained the help of Attorney David P. Fritz ("Mr. Fritz"),[1] was he able to realize his injury and learn that Serlin had created Eagle with the monies obtained from Condundrum. More specifically, with the monies Conundrum obtained through CG de Rothschild's dealings. Serlin admitted as such to Mr. Fritz via email, confirming that he was the Ninety Percent (90%) owner of Eagle and provided financial statements of Eagle that were replicas of Conundrum's latest financial statements. Please see Exhibit G for the email from Serlin to Mr. Fritz and Exhibit H for mirrored financial statements of Eagle and Conundrum.

25. Accordingly, CG de Rothschild brings this action against Serlin for fraudulent inducement, fraud, willful misconduct, slander, tortious interference, and breach of contract. Additionally, CG de Rothschild seeks damages against Serlin for violation of Section 275.204-2 of the Investment Advisors Act of 1940 for Serlin's fraudulent promise of equity in Conundrum.

[1] Please note that at no time did Attorney Fritz represent CG de Rothschild.

Finally, CG de Rothschild brings a claim, in the alternative, against Serlin for tortious interference with his ability to conduct business.

## THE PARTIES

26. Plaintiff Charles Gregoire de Rothschild resides at 321 East 43rd Street, Penthouse 1114, New York, New York 10017. CG de Rothschild had an office space in New York, New York that he allowed Conundrum to operate out of for its New York relations.

27. Defendant Jordan D. Serlin resides at 17076 Boca Club Blvd, Apt. 5, Boca Raton, Florida 33487. At the time of the events in this Verified Complaint, Serlin conducted Conundrum out of CG de Rothschild's office in New York, New York.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this civil action which includes a claim arising under Section 275.204-2 of Investment Advisors Act of 1940, codified as 17 CFR § 275.204-2, and the remaining claims are so related to the federal claim that they form part of the same case, controversy, and are derived from the common nucleus of operative fact.

29. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), in that this is a civil action between citizens of different states and the amount in controversy exceeds a sum or value of Seventy Five Thousand U.S. Dollars ($75,000), exclusive of interest and costs.

30. Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claims in this action occurred in this district. Additionally, when the events took place, Serlin worked out of and conducted Conundrum's business out of CG de Rothschild's office in this district.

## JURY DEMAND

31. Plaintiff demands a trial by jury of all issues raised in this Complaint.

## FACTS OF THE CASE

### I. CG de Rothschild's Successful Career Prior to Conundrum

32. CG de Rothschild is an accomplished executive with nearly five decades of experience in the banking field. Serving in leadership positions in companies ranging from mid-size startups to large, multinational corporations, he has a proven track record of stimulating growth across diverse, global business environments. CG de Rothschild had previously worked with Eric Attias, CEO of UnionBank in Geneva and Managing Partner of Société Générale, Kenneth Bock, CEO of Munich Re Group and Chairman of Munich Reinsurance America, and Thomas O'Dell, Chairman of ConocoPhillips and President of DuPont.

33. Prior to joining Conundrum, CG de Rothschild was most recently the President and Owner of GDR Privée, a financial planning company.

### II. Defendant Fraudulently Induced CG de Rothschild to Work at Conundrum

A. Defendant's Pursuit of CG de Rothschild and Fraudulent Misrepresentations Regarding Compensation

34. In 2010, Serlin was not gaining the momentum he needed to make Conundrum profitable. Serlin was not getting enough investments in Conundrum. Serlin knew he needed an esteemed partner that knew the finance industry and that others knew in the finance industry.

35. At the time, CG de Rothschild was not looking for any other employment or soliciting potential employment opportunities.

36. When Serlin met CG de Rothschild, Serlin knew or shortly thereafter learned of CG de Rothschild's positive reputation in the finance industry.

37. Serlin realized that CG de Rothschild would bring goodwill to Conundrum if CG de Rothschild were to be a part of Conundrum, and so, Serlin made CG de Rothschild an attractive offer to come into Conundrum with GDR Privée as a one-third (1/3) member of Conundrum. This is a larger share than most initial offers in the finance market, however, Serlin realized CG de Rothschild's worth and did not want CG de Rothschild to turn him down.

38. By the time Serlin offered CG de Rothschild to be a one-third (1/3) member of Conundrum, Serlin had actual knowledge of CG de Rothschild's positive reputation in the finance industry.

39. As a one-third (1/3) member, CG de Rothschild would be entitled to access the accountings of Conundrum and have approval rights over multiple business transactions.[2] Please refer to Articles 6 and 7 in Exhibit B for the detailed list.

B. Defendant's Tactics Succeed: CG de Rothschild Signs Operating Agreement

40. Relying on Serlin's representations concerning his compensation, CG de Rothschild signed the Operating Agreement on or about June 10, 2010 and joined Conundrum as a one-third (1/3) member under his company, GDR Privée.

## II. Defendant Continues Fraud to Keep CG de Rothschild at Conundrum

41. Serlin's fraud did not cease once CG de Rothschild joined Conundrum. As detailed below, Serlin induced him to remain at Conundrum through a series of misrepresentations and prevarications regarding the status of his supposed equity package. This pattern of behavior demonstrates that Serlin's representations regarding the equity package CG de Rothschild would receive were made in bad faith from the outset and that, when CG de Rothschild entered into the Operating Agreement, Serlin never intended to provide CG de Rothschild with any compensation.

---

[2] Please note Serlin and CG de Rothschild were the only "members" of Conundrum, as recognized by the Operating Agreement.

42. About three months later in September 2010, Serlin amended the Operating Agreement for the first time, seeming to give CG de Rothschild more authority and compensation. CG de Rothschild was now to be a forty-nine percent (49%) owner of Conundrum and receive fifty percent (50%) of the profits. Serlin also agreed that any "major, extraordinary or unusual decision must be approved in writing by both parties." Please refer back to Exhibit C.

43. Serlin knew that Amendment #1 was an incredibly attractive offer, on top of his already generous starting arrangement of Operating Agreement. Serlin knew that CG de Rothschild would be induced to stay at Conundrum because CG de Rothschild would not receive a better offer elsewhere, because no one could rightfully offer CG de Rothschild what Serlin did if they actually planned on fulfilling the Agreement.

44. CG de Rothschild relied on the Agreement and Serlin's promises and continued to work at Conundrum, pouring in the goodwill of his name and connections into Conundrum. Conundrum profited as a result.

45. In March 2011, Serlin further agreed that he would inform CG de Rothschild "in writing, in advance, of any non-standard expense[] which may be incurred by [Conundrum] in excess of $1,000.00" and that Serlin would be "disallowed from incurring any such expense. . . [until CG de Rothschild] has been notified, in writing, and has responded to [Serlin] with [his] understanding that such an expense is justified." Please see Exhibit D. This only induced CG de Rothschild to stay with Conundrum more, as he was already earning fifty percent (50%) of the profits as the minority interest owner, would have approval over any major business decisions, and now would have approval over all non-standard expenses Conundrum incurs over one thousand dollars ($1,000), giving CG de Rothschild more transparency and authority with respect to Conundrum's detailed accountings.

46. Amendment #2 was to span over the next three months from the date of the signing of Amendment #2 and at the time, Serlin and CG de Rothschild would "discuss if this threshold should be maintained, be raised, or removed." Please refer back to Exhibit D. In June 2011, CG de Rothschild and Serlin did meet again and discussed maintaining Amendment #2 for a longer time. However, Serlin had no intentions of keeping his word. Though Serlin and CG de Rothschild did not later agree to a maintenance of Amendment #2 in writing, Amendment #2 states that only a discussion will be held, which was so held three months from the signing of Amendment #2, as stated.

47. Through the Operating Agreement and its subsequent amendments, CG de Rothschild was fraudulently induced to work at and stay with Conundrum because Serlin had no intentions of ever honoring the Agreement. Serlin never had the intention of paying CG de Rothschild any monies and never had the intention of giving CG de Rothschild joint approval over any of Conundrum's decisions or accountings.

**III. Defendant Breaches Agreement**

48. Serlin's bad acts were not confined to fraudulently inducing CG de Rothschild to join Conundrum and lying to him to induce him to remain at Conundrum. Serlin also breached several significant provisions of the Operating Agreement. These breaches are discussed below.

A. Defendant Never Paid CG de Rothschild a Share of Proceeds of Conundrum

49. As CG de Rothschild initially had a one-third (1/3) interest in Conundrum which grew to forty nine percent (49%) interest, and he was entitled for fifty percent (50%) of the profits of Conundrum, and Conundrum in fact did profit over One Hundred Seventy Seven Million Dollars ($177,000,000+) due directly to CG de Rothschild's contributions, CG de Rothschild

should have received at minimum Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

50. CG de Rothschild did not ever receive Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500) as compensation from Conundrum. In fact, Serlin never paid CG de Rothschild any portion of the profit proceeds from Conundrum, in breach of the Agreement. When CG de Rothschild began asking to see Conundrum's books and accountings so he could get paid his fair share, Serlin closed Conundrum without CG de Rothschild's knowledge.

51. In fact, Serlin closed Conundrum without ever distributing any monies of Conundrum's to CG de Rothschild and kept all the monies within his assets. As per the Agreement, Serlin should have distributed to CG de Rothschild the portion of Conundrum's profits that CG de Rothschild was legally due. Please refer to Exhibits B, C, and D to see the Agreement.

52. Moreover, Serlin was to make a final distribution of Conundrum when dissolving Conundrum equal to the net income, net loss, distributable cash, and other items to be shared equally between Serlin and CG de Rothschild. Please see Article 10 of the Operating Agreement in Exhibit B.

53. Serlin never paid CG de Rothschild any portion of Conundrum's profits as was owed to CG de Rothschild during the course of his employment with Conundrum, in breach of the Agreement. Further, Serlin never paid CG de Rothschild the final distribution when Serlin dissolved Conundrum, in further breach of the Agreement.

B. Defendant Closed Conundrum without CG de Rothschild's Consent

54. When CG de Rothschild began asking to see Conundrum's books and accountings so he could get paid his fair share, Serlin closed Conundrum without CG de Rothschild's knowledge.

55. When Serlin dissolved Conundrum on or about the peculiar leap year date of February 29, 2012, Serlin did so without CG de Rothschild's knowledge and, much less, CG de Rothschild's consent to do so, in writing. Please see Exhibit F for Conundrum's Article of Dissolution which was only e-signed by Serlin.

56. As per the amendments of the Agreement, Serlin was obligated to notify CG de Rothschild he wanted to close Conundrum and was obligated to wait to close Conundrum until CG de Rothschild provided a written agreement confirming his consent to close Conundrum. "Any major, extraordinary or unusual decisions must be approved in writing by both parties," as stated in Amendment #1 attached in Exhibit C.

57. Serlin breached the Agreement when he did not notify CG de Rothschild and wait for CG de Rothschild's approval to close Conundrum, a major, extraordinary, and unusual decision.

C. Defendant Never Showed CG de Rothschild Conundrum's Books and Accountings, as Required by the Agreement and Despite CG de Rothschild's Requests

58. Prior to Serlin signing the Articles of Dissolution of Conundrum, CG de Rothschild repeatedly requested to see the books and accountings of Conundrum, as is his right, delineated in Article 6 of the Operating Agreement in Exhibit B.

59. "Any Member shall, upon prior written notice and during normal business hours, have access to the information described in Section 608.4101 of the [Florida Limited Liability Company Act], for the purpose of inspecting or, at the expense of such Member, copying the same." Article 6.1, Exhibit B. Serlin did not comply with Article 6.1 of the Operating Agreement.

60. After the conclusion of 2011, the first complete fiscal year CG de Rothschild was with Conundrum, CG de Rothschild requested, in writing, at minimum on five (5) different

occasions, to see records, books, and accountings of Conundrum. Please see Exhibit I for multiple email requests spanning from January 2012 to February 2012 from CG de Rothschild to Serlin. CG de Rothschild is detailed and extremely clear in his requests. Serlin received CG de Rothschild's requests.

61. Conundrum "shall prepare, or cause to be prepared, and shall furnish each Person who was a Member during the Fiscal Year, within 120 days after the close of such Fiscal Year, (a) Financial Statements for such Fiscal Year and (b) a Schedule K-1 or such other form as shall be necessary to advise all Members relative to their investment in [Conundrum] for federal, state, local, provincial, territorial and foreign income tax reporting purposes." Article 6.2, Exhibit B. Serlin did not comply with Article 6.2 of the Operating Agreement.

62. Serlin never furnished financial statements and a Schedule K-1, or other form to advise CG de Rothschild of his investment for income tax reporting purposes, as required by the Agreement.

63. In fact, when Serlin received CG de Rothschild's written requests, as documented in Exhibit I, from January 20, 2012 to February 16, 2012, to see Conundrum's accountings, books, and records, Serlin forwarded CG de Rothschild's email request to an individual named "Marten," wrongly stating that "there is no such provision" that would allow CG de Rothschild to meet with Serlin and a certified public accountant. Serlin assumes CG de Rothschild is referring to the Dissolution provisions in the Operating Agreement rather than the Accounting provision, because (i) Serlin either knew CG de Rothschild was entitled to his requests as per the Accounting provisions and did not want to acknowledge it, or (ii) Serlin was already gearing for dissolving Conundrum and that is on the forefront of his mind. Please see Exhibit J for

Serlin's email to "Marten" denying CG de Rothschild's request to view Conundrum's books and breaching the Agreement.

64. Serlin never responded directly to CG de Rothschild in regards to CG de Rothschild's requests to view Conundrum's books, accountings, financials, and/or records.

65. In January 2014, CG de Rothschild formally hired Brian Aryai of Icon Compliance Services, to conduct an investigation of all financial transactions relevant to the operations of Conundrum. CG de Rothschild still had no knowledge about where Conundrum's funds were, or more specifically, where CG de Rothschild's due share of Conundrum's profits went.[3]

66. On or about January 31, 2014, Mr. Brian Aryai emailed Serlin directly to inform Serlin of his ongoing violations of the Agreement by not honoring CG de Rothschild's requests.[4] Please see Exhibit K for Mr. Brian Aryai's email to Serlin, on behalf of CG de Rothschild.

67. Serlin never paid out CG de Rothschild any of Conundrum's earnings, of which CG de Rothschild should have received fifty percent (50%) of, Serlin never sought CG de Rothschild's approval for non-standard expenses over one thousand dollars ($1,000), Serlin never allowed CG de Rothschild to even see Conundrum's books, and Serlin certainly did not seek CG de Rothschild's approval when Serlin made the sole major, extraordinary and unusual decision to dissolve Conundrum.

## IV. Defendant Moved Conundrum's Monies to Fund Eagle in Breach of the Agreement

68. At some point in 2012, Serlin moved the monies out of Conundrum's account and into Eagle's account without CG de Rothschild's knowledge. As per the terms of the Agreement, Serlin had to obtain CG de Rothschild's written agreement prior to executing any

[3] This is alleged once more in paragraph 95 for the sake of maintaining chronological order.
[4] This is alleged once more in paragraph 96 for the sake of maintaining chronological order.

"major, extraordinary or unusual decision." Please refer back to Exhibit C. Serlin did not obtain CG de Rothschild's written agreement to vacate Conundrum's funds and move them into Eagle or any other account. Serlin breached the Agreement.

69. Unbeknownst to CG de Rothschild, Serlin created Eagle in 2012, funded by all the monies in Conundrum. Please refer back to Exhibit H for performance sheets of Conundrum and Eagle, in which years 2010 and 2011 are identical.[5] Please also note both of the identical formats of the performance sheets of Conundrum and Eagle.

70. Eagle was not in operation in years 2010 and 2011. Serlin doctored Eagle's performance to create the illusion that Eagle had been established for a longer period to attract clients. The doctored performance of Eagle is actually that of the real performance of Conundrum.

71. While CG de Rothschild was working at Conundrum in 2010 and 2011, Conundrum flourished. After Serlin cut CG de Rothschild out by February 2012 by closing Conundrum, Serlin could not maintain good business at Eagle without CG de Rothschild's expertise. Please see Exhibit H for the high percentages of 57.78% and 48.88% in 2010 and 2011, respectively, and then the drop to 25.78% and 24.90% in 2012 and 2013, respectively.

72. Eagle's performance was publicly advertised on Eagle's public website with the intention of attracting more clients to invest their money into Eagle, and therefore, into Serlin's pockets. Serlin's falsification of Eagle's performance injured the public at large, inducing the public to fraudulently rely on himself, through Eagle, to invest thousands of dollars, to the public's detriment.

[5] Please also note in Exhibit L that Conundrum denotes it is "A Charles Grégoire de Rothschild Group Company". CG de Rothschild was a minority interest holder, but Serlin knew CG de Rothschild's worth and marketed Conundrum through CG de Rothschild's name. Serlin did everything in his power to fraudulent induce CG de Rothschild into staying at Conundrum.

## V. Defendant Has Consistently Been Alleging Falsities About CG de Rothschild to Ensure CG de Rothschild will not be able to Recover and Receive His Rightful Share of Monies

### A. Defendant Lied to the Police to Ruin CG de Rothschild's Name

73. After CG de Rothschild began asking to see Conundrum's records, Serlin executed his intent to never pay CG de Rothschild his compensation and deployed a plan to make sure CG de Rothschild would not be able to recoup the monies that were rightfully due to him.

74. In February 2012, Serlin falsely reported to the NYPD that Mr. Rothschid threatened Serlin an email declaring, "You [will be] held responsible personally for all the consequences according the laws, including penalties according [to the] tax code. I will take everything from you. You [will] pay with your blood." Please refer back to Exhibit E for the police report.

75. To substantiate the claim, Serlin inserted those quoted words in CG de Rothschild's email when forwarding or replying the email to another party.

76. In May 2012, the NYPD subpoenaed all of CG de Rothschild's personal and corporate email messages. The case was marked as closed the same day as the subpoena, after the NYPD discovered the clearly doctored email by Serlin attempting to fraudulently induce the NYPD into believing it was CG de Rothschild that threatened him with the quoted words.

77. It was Serlin's intent for the NYPD to discover the doctored email, convict CG de Rothschild of aggravated harassment, have CG de Rothschild arrested and imprisoned for aggravated harassment, and thus CG de Rothschild would not be able to recoup the monies he was rightfully due.

78. It was also Serlin's intent for the allegation of aggravated harassment to be public knowledge and harm CG de Rothschild's reputation. After cutting CG de Rothschild out,

Serlin needed to narrate the story so that investors would continue working with Serlin without CG de Rothschild's goodwill. Serlin was successful in this intention.

B. Defendant Lied to the FBI to Ruin CG de Rothschild's Name

79. After the NYPD did not convict, arrest, and imprison CG de Rothschild for aggravated harassment, as Serlin primarily intended, Serlin complained about Mr. Rothschid to the FBI in 2013.

80. Serlin hoped the FBI would arrest, or otherwise do away with, CG de Rothschild so that Serlin would not have to pay CG de Rothschild monies owed.

81. Serlin started telling colleagues that CG de Rothschild was being investigated by the FBI.

82. CG de Rothschild was not being investigated by the FBI; this was a complete fabrication of Serlin on CG de Rothschild's character and reputation.

83. Serlin's fabrication further harmed CG de Rothschild's reputation as it became public knowledge that CG de Rothschild was having problems with his business partner and CG de Rothschild was deemed difficult to work with, to have a dishonest character personally and in business, and to skirt the law in his operation of business. This impression was due to Serlin's falsities from the NYPD and FBI investigation.

84. CG de Rothschild has not been able to repair his reputation after Serlin's permanent injury.

C. Defendant's Tactics Succeed: Professionals Refused to Work with CG de Rothschild Due to Defendant's Slanderous Statements and Conduct

85. The banking and finance community at large, including but not limited to bankers, investors, consultants, etc., ("Professionals") refused to work with CG de Rothschild due to his loss of reputation as a result of Serlin's actions.

86. Professionals that had previously worked with CG de Rothschild would no longer work with CG de Rothschild because of his loss of reputation as a result of Serlin's actions. Please see Exhibits L, M, N, and O for written statements from Professionals Mr. Iulian Bucur, Mr. Frederik de Badrihaye, Mr. Fred Schuurman, and Dr. Ronald Chaikin, respectively, stating they stopped doing business with CG de Rothschild because of Serlin's actions that tarnished CG de Rothschild's reputation.

87. Professionals that had never worked with CG de Rothschild before did not want to engage in business with CG de Rothschild because of his loss of reputation as a result of Serlin's actions.

88. Professionals did not want to associate themselves with CG de Rothschild because of CG de Rothschild's loss of reputation as a result of Serlin's actions.

89. Professionals feared they would suffer a loss of reputation if they engaged in business with CG de Rothschild because of CG de Rothschild's loss of reputation as a result of Serlin's actions.

## VI. CG de Rothschild Realizes the Full Extent of Defendant's Fraudulent Inducement and His Resulting Injury

90. After learning of Conundrum's closure in 2012, CG de Rothschild began asking the anyone and everyone that he had had worked with during the course of business of Conundrum to see if anyone had any knowledge about what Serlin was doing after Conundrum.

91. Professionals would not speak to CG de Rothschild because of CG de Rothschild's loss of reputation, as a result of Serlin's actions. Serlin refused to respond to any of CG de Rothschild's countless emails, calls, texts, and other forms of communication. CG de Rothschild was unable to learn of his injury for months.

92. It was not until November 2013 when CG de Rothschild obtained the help of his friend Mr. Fritz, and learned for the first time that Serlin had created Eagle. Please refer back to Exhibit G in which Serlin confirms he is the ninety percent (90%) owner of Ealge.

93. CG de Rothschild later learned that Serlin funded Eagle's creation with Conundrum's monies and the monies owed to CG de Rothschild when he saw the identical performances of Conundrum and Eagle, as shown in Exhibit H.

94. After learning of Eagle, CG de Rothschild attempted to obtain his rightful share of the monies that were fraudulently used to create Eagle. However, by 2014, CG de Rothschild still had not received any of the monies he was rightfully due.

95. In January 2014, CG de Rothschild formally hired Brian Aryai of Icon Compliance Services, to conduct an investigation of all financial transactions relevant to the operations of Conundrum. CG de Rothschild still had no knowledge about where Conundrum's funds were, or more specifically, where CG de Rothschild's due share of Conundrum's profits went.

96. On or about January 31, 2014, Mr. Brian Aryai emailed Serlin directly to inform Serlin of his ongoing violations of the Agreement by not honoring CG de Rothschild's requests.

97. To this day, Serlin has never paid CG de Rothschild monies owed equal to or around, at minimum, **Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500)**.

## FIRST CLAIM FOR RELIEF
Fraudulent Inducement

98. CG de Rothschild repeats and realleges paragraphs 1 through 97, inclusive, as if set forth fully herein.

99. In order to induce CG de Rothschild to work at Conundrum, Serlin represented repeatedly that CG de Rothschild would receive an equity package and that CG de Rothschild would have approval over major business decisions.

100. These were misrepresentations of material fact that were false when made to CG de Rothschild.

101. At the time Serlin made the representation, Serlin knew that he would not provide CG de Rothschild the promised compensation package nor would be seek CG de Rothschild's approval of any major business decisions.

102. Thus, Serlin knew the representations were false when Serlin made them to CG de Rothschild and made the representations with a present intent to deceive CG de Rothschild and induce his reliance on their misrepresentations.

103. Serlin's conduct was willful or wanton in that he made the representations with a conscious and deliberate disregard of the interests of CG de Rothschild.

104. CG de Rothschild justifiably relied on the representations without notice of their falseness.

105. CG de Rothschild was injured by the misrepresentations. Among other things, Conundrum profited solely from CG de Rothschild's work, and CG de Rothschild was never paid his compensation nor was CG de Rothschild given the basic respect to be notified and have approval over major business decisions.

106. As a result of Serlin's actions, CG de Rothschild suffered damages in an amount to be determined at trial but not less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

107. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

Fraud

108. CG de Rothschild repeats and realleges paragraphs 1 through 107, inclusive, as if set forth fully herein.

109. Once CG de Rothschild began his employment pursuant to the Agreement at Conundrum, Serlin made numerous false and misleading representations to CG de Rothschild regarding his compensation package. Serlin repeatedly assured CG de Rothschild that he would be receiving his compensation package despite having no intention to ever award CG de Rothschild equity. Thus, Serlin's statements were material misrepresentations of a fact that Serlin made with the knowledge of the falsity of the statements.

110. Serlin made the misrepresentations in order to induce CG de Rothschild to remain employed at Conundrum.

111. Serlin's conduct was willful or wanton in that he made the representations with a conscious and deliberate disregard of the interests of CG de Rothschild.

112. CG de Rothschild justifiably relied on Serlin's representations without notice of their falseness.

113. CG de Rothschild was injured by the misrepresentations. Among other things, CG de Rothschild, continued working at Conundrum pouring his goodwill into Conundrum and driving up profits for Conundrum without ever realizing his share of the profits.

114. Serlin never paid CG de Rothschild for the work CG de Rothschild expended.

115. As a result of Serlin's actions, CG de Rothschild realized his injuries in November 2013, at the earliest, and suffered damages in an amount to be determined at trial but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

116. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

**THIRD CLAIM FOR RELIEF**
Violation of § 275.204-2 of Investment Advisors Act of 1940

117. CG de Rothschild repeats and realleges paragraphs 1 through 116, inclusive, as if set forth fully herein.

118. Serlin qualifies for an "investment adviser" as defined by 15 U.S.C. § 80b-2(a)(11).

119. Accordingly, Serlin registered or was required to register with the Securities and Exchange Commission ("SEC") under 15 U.S.C. § 80b-3.

120. Accordingly, Serlin must abide by 17 C.F.R. § 275.204-2, which sets regulations on investment advisers and their maintenance of books and records.

121. As per 17 C.F.R. § 275.204-2(e)(1), "all books and records required to be made under the provisions of paragraphs (a) to (c)(1)(i), inclusive, and (c)(2) of this section (except for books and records required to be made under the provisions of paragraphs (a)(11), (a)(12)(i), (a)(12)(iii), (a)(13)(ii), (a)(13)(iii), (a)(16), and (a)(17)(i) of this section), shall be maintained and preserved in an easily accessible place for a period of not less than five years from the end of the fiscal year during which the last entry was made on such record, the first two years in an appropriate office of the investment adviser" (underline added).

122. Despite CG de Rothschild's requests to see Conundrum's books and records and the SEC's requirement to maintain Conundrum's books and records in an easily accessible place,

Serlin did not allow CG de Rothschild to view Conundrum's books, so Conundrum's books were not in an easily accessible place.

123. Serlin's conduct violates Section 275.204-2 of Investment Advisors Act of 1940.

124. As a direct result of Serlin's actions, CG de Rothschild has suffered damages in an amount to be determined at trial but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

125. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

**FOURTH CLAIM FOR RELIEF**
Breach of Contract

126. CG de Rothschild repeats and realleges paragraphs 1 through 125, inclusive, as if set forth fully herein.

127. CG de Rothschild and Serlin are the only parties to the Agreement, a contract which was validly entered into and was supported by adequate compensation.

128. CG de Rothschild has performed all of his obligations under the Agreement.

129. Under the Agreement, Serlin agreed to, among other things, the following:

a. To share fifty percent (50%) of Conundrum's profits with CG de Rothschild, as set forth in Exhibit C;

b. To wait for written approval from CG de Rothschild before executing any major, extraordinary, or unusual decision with Conundrum, as set forth in Exhibit C;

c. To wait for written consent from CG de Rothschild before incurring any non-standard expense over one thousand dollars ($1,000) for Conundrum, as set forth in Exhibit D;

d. To make information described in Section 608.4101 of the Florida Limited Liability Company Act available to CG de Rothschild upon CG de Rothschild's written request; and

e. To prepare and furnish to CG de Rothschild financial statements of fiscal years and Schedule K-1s, or alternative forms, for income tax reporting purposes, as set forth in Article 6.2 of Exhibit B.

130. Serlin breached the Agreement through his following actions and inactions:

a. Refusing to share fifty percent (50%) of Conundrum's profits with CG de Rothschild;

b. Executing major, extraordinary, or unusual decisions with Conundrum without CG de Rothschild's approval or knowledge;

c. Incurring non-standard expense over one thousand dollars ($1,000) for Conundrum without CG de Rothschild's approval or knowledge;

d. Refusing to make information described in Section 608.4101 of the Florida Limited Liability Company Act available to CG de Rothschild despite CG de Rothschild's multiple written requests; and

e. Refusing to furnish to CG de Rothschild financial statements of fiscal years and Schedule K-1s, or alternative applicable forms.

131. As a result of Serlin's breach of the Agreement, CG de Rothschild has suffered damages in an amount to be determined at trial but but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

132. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

**FIFTH CLAIM FOR RELIEF**
Tortious Interference with Business Transactions

133. CG de Rothschild repeats and realleges paragraphs 1 through 132, inclusive, as if set forth fully herein.

134. CG de Rothschild alleges Serlin tortuously interfered with CG de Rothschild's business transactions.

135. Serlin made false allegations with the intent of defiling CG de Rothschild's ability to conduct business transactions with Professionals.

136. Serlin made false allegations to the NYPD with the intent of defiling CG de Rothschild's ability to conduct business transactions with Professionals.

137. Serlin made false allegations to Professionals with the intent of defiling CG de Rothschild's ability to conduct business transactions with Professionals when Serlin falsely claimed CG de Rothschild was being investigated by the FBI.

138. Serlin succeeded in defiling CG de Rothschild's ability to conduct business transactions with Professionals as CG de Rothschild has been having problems engaging with Professionals as colleagues or clients, as a result of Serlin's tortious interference.

139. As a result of Serlin's tortious interference with CG de Rothschild's business transactions, CG de Rothschild has suffered damages in an amount to be determined at trial but but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

140. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

*[This section is intentionally left blank.]*

**SIXTH CAUSE OF ACTION**
Negligent Infliction of Emotional Distress

141. CG de Rothschild repeats and realleges paragraphs 1 through 140, inclusive, as if set forth fully herein.

142. As a result of Serlin's false claims to the NYPD, CG de Rothschild was investigated by the NYPD. CG de Rothschild was under extreme emotional distress during the entire investigation and had to rearrange his schedule every day to accommodate the NYPD's investigation.

143. CG de Rothschild was under extreme emotion distress during the entirety of the NYPD investigation due to Serlin's false claims to the NYPD.

144. As a result of Serlin's false tip to the FBI, CG de Rothschild was under emotional distress of possibly being investigated by the FBI.

145. As a result of Serlin's allegations to Professionals that CG de Rothschild was being investigated by the FBI, CG de Rothschild was under extreme emotional distress as Professionals slowly turned him down, refused to work with him, and distanced themselves from CG de Rothschild.

146. To this day, CG de Rothschild still suffers emotional distress as Professionals have continued to not engage in business with CG de Rothschild due to Serlin's actions.

147. As a result of Serlin's negligent infliction of emotional distress, CG de Rothschild has suffered, and continues to suffer, damages in an amount to be determined at trial but but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

148. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
Defamation

149. CG de Rothschild repeats and realleges paragraphs 1 through 148, inclusive, as if set forth fully herein.

150. Serlin's false report to the NYPD constitutes a slanderous statement that defamed CG de Rothschild's good reputation. Serlin spread rumors of the NYPD investigation to Professionals.

151. Prior to Serlin's false report to the NYPD, CG de Rothschild was engaged in healthy business with Professionals and was recognized by his goodwill was recognized by his peers.

152. Serlin's false tip to the FBI constitutes a slanderous statement that defamed CG de Rothschild's previously good reputation and goodwill. Serlin spread rumors of a FBI investigation to Professionals.

153. Serlin has since that time to as recently as this year in 2019 consistently been speaking ill of CG de Rothschild and spreading falsities about him so as to defame CG de Rothschild's previously good reputation and goodwill.

154. As a result of Serlin's defamatory statements and actions, CG de Rothschild has suffered damages in an amount to be determined at trial but but no less than Eleven Million Sixty Two Thousand Five Hundred U.S. Dollars ($11,062,500).

155. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

*[This section is intentionally left blank.]*

**EIGHTH CAUSE OF ACTION**
Loss of Reputation

156. CG de Rothschild repeats and realleges paragraphs 1 through 155, inclusive, as if set forth fully herein.

157. Serlin's defamatory actions and statements, false allegations, false reports, false claims, false inducement, tortious interference, emotional distress, fraud, breach of contract, and violation of SEC regulations have all resulted in CG de Rothschild suffering from a loss of reputation.

158. Further, and as shown in Exhibits L, M, and N, CG de Rothschild has suffered a worldwide loss of reputation, including within the United States. As the banking and finance industry that CG de Rothschild engages in requires worldwide connections to prosper, CG de Rothschild's international loss of reputation is detrimental.

159. As a result of Serlin's conduct, CG de Rothschild has suffered damages in an amount to be determined at trial for his loss of reputation and past losses from the resulting business he lost.

160. Additionally, as a result of Serlin's willful or wanton conduct, CG de Rothschild is entitled to punitive damages in an amount to be determined at trial.

**RELIEF REQUESTED**

**WHEREFORE**, CG de Rothschild respectfully requests the following relief:

1. Actual damages for loss of investment $50,000.00, plus money earned but not paid of $64,000.00 in addition to his charge of $150,000.00 for the platform and insurance for $15,000.00 that was never placed for a total of $279,000.00.

2. In addition to such damages are due CG de Rothschild for loss of reputation and resulting loss of business due to the conduct of James Serlin.

3. Punitive damages against Serlin in an amount to be determined at trial;

4. Pre-judgement and post-judgement interest against Serlin; and

5. Such other and further relief as the Court may deem just and proper.

Dated: New York, New York
December 13, 2019

Respectfully submitted,

**LEONARD ZACK & ASSOCIATES**

Leonard Zack, Esq.
*Attorneys for Plaintiff*
505 Park Avenue, Floor 18
New York, New York 10022
Tel: (212) 754-4050

To: **JORDAN D. SERLIN**
*Defendant*
17076 Boca Club Blvd, Apt. 5
Boca Raton, Florida 33487

# EXHIBITS

**Exhibits Table of Contents**

Conundrum's Articles of Organization....A

Operating Agreement ....B

First Amendment to Operating Agreement ....C

Second Amendment to Operating Agreement....D

NYPD False Police Report....E

Conundrum's Article of Dissolution.... F

Serlin Admitting He Owned Eagle ....G

Eagle Financial Statements Replicating that of Conundrum's ....H

Mr. Rothschild Requesting to see Conundrum's Records .... I

Serlin Refusing to Allow Mr. Rothschild to see Conundrum's Records .... J

Mr. Rothschild Investigating Serlin for Conundrum's Financials....K

Statement from Mr. Iulian Bucur ....L

Statement from Mr. Frederik de Badrihaye ....M

Statement from Mr. Fred Schuurman....N

Statement from Dr. Ronald Chaikin....O

# EXHIBIT A

# Electronic Articles of Organization For Florida Limited Liability Company

L10000040211
FILED 8:00 AM
April 14, 2010
Sec. Of State
lsellers

## Article I

The name of the Limited Liability Company is:

CONUNDRUM CAPITAL, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

17076 BOCA CLUB BLVD
#5
BOCA RATON, FL. 33487

The mailing address of the Limited Liability Company is:

17076 BOCA CLUB BLVD
#5
BOCA RATON, FL. 33487

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

JORDAN D SERLIN
17076 BOCA CLUB BLVD
#5
BOCA RATON, FL. 33487

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature: JORDAN D SERLIN



L10000040211
FILED 8:00 AM
April 14, 2010
Sec. Of State
lsellers

## Article V

The name and address of managing members/managers are:

Title: MGRM
JORDAN D SERLIN
17076 BOCA CLUB BLVD #5
BOCA RATON, FL. 33487

Signature of member or an authorized representative of a member

Signature: JORDAN SERLIN

# EXHIBIT B

# LIMITED LIABILITY COMPANY OPERATING AGREEMENT

OF

Conundrum Capital LLC

June 10, 2010

*Adding*

*GDR Privée as represented by Charles Grégoire de Rothschild as a 1/3 (33.33%) Member*






**LIMITED LIABILITY COMPANY OPERATING AGREEMENT**
**OF**
**Conundrum Capital LLC**

TABLE OF CONTENTS


Page

ARTICLE I - DEFINED TERMS; EXHIBITS, SCHEDULES, ETC. ....... 1

1.1 Definitions. ....... 1
1.2 Other Defined Terms. ....... 10
1.3 References. ....... 10

ARTICLE II - ORGANIZATION ....... 10

2.1 Organization of Company. ....... 10
2.2 Name. ....... 10
2.3 Purpose; Character of the Business. ....... 10
2.4 Principal Office. ....... 10
2.5 Registered Agent and Registered Office. ....... 11
2.6 Registered Members. ....... 11
2.7 Members. ....... 11
2.8 Limited Liability. ....... 11
2.9 Scope of Members' Authority. ....... 11

ARTICLE III - CAPITAL CONTRIBUTIONS ....... 11

3.1 Initial Capital Contributions. ....... 11
3.2 Withdrawal; Return of Capital; Interest. ....... 12
3.3 Waiver of Appraisal Rights. ....... 12
3.4 Obligation to Make Additional Capital Contributions. ....... 12

ARTICLE IV - ALLOCATION OF NET INCOME AND NET LOSS; ETC. ....... 12

4.1 Net Income and Net Loss. ....... 12
4.2 Special Allocations. ....... 12
4.3 Tax Allocations. ....... 14
4.4 Effect on Allocations of New Members or Assignees. ....... 14
4.5 Tax Withdrawal. ....... 14
4.6 No Effect on Distributable Cash. ....... 14

ARTICLE V - DISTRIBUTIONS ....... 15





ARTICLE VI - ACCOUNTING AND ADMINISTRATIVE MATTERS ..... 15

6.1 Books and Records. ..... 15
6.2 Reports. ..... 15
6.3 Tax Matters Partner ..... 15
6.4 Tax Elections ..... 15
6.5 Reimbursement. ..... 15

ARTICLE VII - MANAGEMENT OF COMPANY ..... 16

7.1 Members; Rights, Power and Authority; Managing Member Authority. ..... 16
7.2 Resignation of the Managing Member ..... 17
7.3 Actions Requiring Member Approval ..... 18
7.4 Removal of the Managing Member. ..... 19
7.5 Duties and Obligations of the Members. ..... 19
7.6 A Member's Duty of Loyalty ..... 19
7.7 Member Meetings. ..... 19
7.8 Notice. ..... 20
7.9 Quorum and Voting. ..... 20
7.10 Proxies. ..... 20
7.11 Waiver of Notice. ..... 20
7.12 Telephonic Meetings ..... 20
7.13 Compensation; Reimbursement of Expenses ..... 21
7.14 No Authority of Individual Member. ..... 21
7.15 Presumption of Assent. ..... 21
7.16 Decision of Members by Written Consent ..... 21
7.17 Related Party Transactions ..... 21
7.18 Confidentiality and Non-Competition ..... 21

ARTICLE VIII - LIMITATION ON LIABILITY AND INDEMNIFICATION ..... 22

8.1 Exculpation of Liability. ..... 22
8.2 Liability of Exculpated Parties and Members. ..... 22
8.3 Indemnification of the Managing Member and Affiliates. ..... 23
8.4 Advancement of Legal Costs and Expenses. ..... 23
8.5 Provisions Not Exclusive. ..... 23
8.6 Insurance. ..... 24

ARTICLE IX - TRANSFER OF MEMBERSHIP INTERESTS; PURCHASE OPTION UPON DEATH, BANKRUPTCY ..... 24

9.1 Transfer; First Right of Refusal. ..... 24
9.2 Transferees As Substitute Members; New Members ..... 25






9.3 Terms of Admission of New Members; Creation of Preferred or Special Interests. 25
9.4 Death, Incapacity, Bankruptcy or Insolvency of a Member; Purchase Option. 26

ARTICLE X - DISSOLUTION AND TERMINATION 27

10.1 Dissolution. 27
10.2 Accounting. 27
10.3 Liquidating Trustee. 27
10.4 Liquidating Distribution. 28
10.5 Distributions in Kind. 28

ARTICLE XI - MISCELLANEOUS 29

11.1 Appointment of Attorney in Fact. 29
11.2 Amendment. 29
11.3 Further Action. 30
11.4 Notices. 30
11.5 Governing Law; Venue; Jurisdiction; Attorneys' Fees. 30
11.6 Headings. 30
11.7 Pronouns. 31
11.8 Benefits; Binding Effect. 31
11.9 No Waiver. 31
11.10 Severability. 31
11.11 Entire Agreement. 31
11.12 Counterparts; Telecopier. 31
11.13 Third Party Beneficiaries. 32
11.14 Rule of Construction that Ambiguities are to be Construed Against the Drafter Not Applicable. 32






# LIMITED LIABILITY COMPANY OPERATING AGREEMENT
# OF
# Conundrum Capital LLC

In accordance with the Florida Limited Liability Company Act and subject to the Articles of Organization, which were initially filed on or around March 1, 2010 with the Florida Secretary of State, Jordan Serlin, and such other persons or entities who from time to time are signatories hereto (the "Members"), adopt the following Limited Liability Company Operating Agreement regarding the conduct of the business and affairs of Conundrum Capital LLC, a Florida limited liability company (the "Company").

## WITNESETH:

WHEREAS, the initial Members named here: Jordan D. Serlin and ***GDR Privée*** as represenred by Charles Grégoire de Rothschild, have caused to be formed and modified the participating members of a limited liability company named Conundrum Capital LLC (the "Company") under the Florida Limited Liability Act;

NOW, THEREFORE, set forth below are the regulations, terms and conditions of the operation of the Company.

## ARTICLE I - DEFINED TERMS; EXHIBITS, SCHEDULES, ETC.

### 1.1 Definitions

As used in this Agreement, the following terms shall have the respective meanings indicated below:

**Act** means the Florida Limited Liability Company Act, as the same may be amended from time to time.

**Adjusted Capital Account Deficit** means, with respect to any Member, the deficit balance, if any, in such Members Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a) decrease such deficit by any amounts which such Member is obligated or deemed obligated to restore pursuant to this Agreement or the next to last sentence of each of Regulation Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b) Increase such deficit by the items described in Regulation Section 1.704-1(b) (2) (ii) (d) (4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulation Section 1.704-1(b) (2) (ii) (d) and shall be interpreted consistently





therewith.

**Affiliate** means any Person who or which, directly or indirectly, through one or more intermediaries, controls or is controlled by, or is under common control with an entity (the term control for purposes of this definition meaning the ability, whether by ownership of shares or other equity interests, by contract or otherwise, to elect a majority of the directors of a corporation, to select the managing or general partner of a partnership, or otherwise to select, or have the power to remove and then select, a majority of those Persons exercising governing authority over an entity).

**Agreement** means this Limited Liability Company Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time, as the context requires.

**Articles of Organization** means the Articles of Organization of the Company as filed with the Secretary of State of Florida, as the same may be amended, corrected or restated from time to time.

**Bankrupt Member** means any Member (a) that (i) makes a general assignment for the benefit of creditors; (ii) files a voluntary bankruptcy petition; (iii) becomes the subject of an order for relief or is declared insolvent in any federal or state bankruptcy or insolvency proceedings; (iv) files a petition or answer seeking for the Member a reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law; (v) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in a proceeding of the type described in sub clauses (i) through (iv) of this clause (a); or (vi) seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties; or (b) against which, a proceeding seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any law has been commenced and sixty (60) days have expired without dismissal thereof or with respect to which, without the Member's consent or acquiescence, a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties has been appointed and sixty (60) days have expired without the appointments having been vacated or stayed, or sixty (60) days have expired after the date of expiration of a stay, if the appointment has not previously been vacated.

**Business Day** means any day on which banks are open for business in **[Palm Beach]** County, Florida.

**Capital Account** means, with respect to any Member, the separate book account which the Company shall establish and maintain for each Member in accordance with Section 704(b) of the Code and Regulation Section 1.704-1(b)(2)(iv) and such other provisions of Regulation Section 1.704-1(b) that must be complied with in order for the Capital Accounts to be determined in accordance with the provisions of the Regulations. In furtherance of the foregoing, the Capital Accounts shall be maintained in compliance with Regulation Section 1.704-1(b)(2)(iv), and the provisions hereof shall be interpreted and applied in a manner consistent therewith.

**Capital Contribution** means, with respect to each Member, the amount of money or

property contributed to the Company by such Member from time to time.

**Code** means the Internal Revenue Code of 1986, as amended, or any replacement or successor law thereto.

**Company Minimum Gain** has the meaning ascribed to partnership minimum gain in Regulation Sections 1.704-2(b)(2) and 1.704-2(d).

**Depreciation** means, for each Fiscal Year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such year or other period in accordance with the depreciation method elected by the Company with respect to such asset, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction allowable for such year or other period bears to such beginning adjusted tax basis or as otherwise required under Section 1.704-1(b)(2)(iv)(g)(3) of the Regulations, or, in the reasonable discretion of the Members, as otherwise permitted thereunder.

**Distributable Cash** means, with respect to any Fiscal Year or other applicable period, the excess, if any, as determined by the Managing Member, of (a) all cash of the Company from all sources for such period, including, without limitation, receipts from operations, contributions of capital by the Members, proceeds of borrowing or from the issuance of securities by the Company, deposits and all other Company cash sources and all Company cash reserves on hand at the beginning of such period over (b) all cash expenses and capital expenditures of the Company for such period, all payments of principal and interest on account of Company indebtedness and such reasonable cash reserves as the Managing Member deems necessary for any Company needs (or those mandated by law, contract or the Company's debt instruments).

**Entity** means any corporation, partnership (general, limited or other), limited liability company, company, trust, business trust, cooperative or association.

**Event of Bankruptcy** means any event that causes a Member to be deemed a Bankrupt Member.

**Financial Statements** means, for any Fiscal Year, the financial statements (consisting of a balance sheet, statement of operations, statement of Members equity and statement of cash flows) of the Company. The Financial Statements shall be prepared in accordance with generally accepted accounting principles and shall be consistent with the books and records of the Company.

**Fiscal Year** means the twelve-month period ending on December 31 of each year or such other fiscal year as the Managing Member may select in his reasonable discretion from time to time in accordance with the Code and the Regulations.

**Gross Asset Value** means, with respect to any asset of the Company, the adjusted basis





of such asset for federal income tax purposes, except as follows:

(a) The Gross Asset Value of any asset contributed by a Member to the Company shall, as of the date of such contribution and subject to further adjustment as herein provided, be the gross fair market value of such asset, as reasonably determined by the Managing Member or otherwise agreed upon by the Managing Member and the contributing Member.

(b) The Gross Asset Values of all Company assets (including assets contributed to the Company) shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Managing Member, as of each of the following times: (i) the acquisition of additional Units by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property or cash in consideration of the redemption, or partial redemption, of the Units of the Member or Members to whom such distribution shall be made if, in connection therewith, the Managing Member reasonably determines that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company; and (iii) the liquidation of the Company within the meaning of Regulation Section 1.704-1(b)(2)(ii)(g).

(c) The Gross Asset Value of any Company asset distributed to any Member shall be the gross fair market value of such asset on the date of distribution as reasonably determined by the Managing Member.

(d) The Gross Asset Value of any Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted to the extent the Managing Member determines that an adjustment pursuant to subparagraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (d).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to any of the foregoing, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Net Income and Net Losses.

**Liquidating Trustee** means such Person as is selected at the time of dissolution by a Majority in Interest of the Members, which Person may include, an Affiliate of any Member. The Liquidating Trustee shall be empowered to give and receive notices, reports and payments in connection with the dissolution, liquidation and/or winding-up of the Company and shall hold and exercise such other rights and powers as are necessary or required to permit all parties to deal with the Liquidating Trustee in connection with the dissolution, liquidation, and/or winding-up of the Company.

**Majority in Interest of the Members** means Members collectively holding in excess of 50% of the outstanding Units, not including Units of a Defaulted Member(s) (as defined herein



below).

**Managing Member** means Jordan Serlin, as appointed in Section 7.1 of the Agreement.

**Member Nonrecourse Debt** has the meaning ascribed to partner nonrecourse debt in Regulation Section 1.704-2(b) (4).

**Member Nonrecourse Debt Minimum Gain** means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt was treated as a Nonrecourse Liability, determined in accordance with Regulation Sections 1.704-2(i) (2) and (3).

**Member Nonrecourse Deductions** has the meaning ascribed to partner nonrecourse deductions in Regulation Sections 1.704-2(i)(1) and 1.704-2(i)(2).

**Members** means the holders of Units in the Company, which includes the Members named in the preamble to this Agreement and admitted to the Company in accordance with this Agreement, as well as such other Persons who may be admitted hereafter as additional Members in accordance with this Agreement and who have become signatories hereto, all of whom are listed on Exhibit A attached hereto and incorporated herein by reference, as the same shall be amended from time to time.

**Membership Interest** means the Units owned by a Member, which shall entitle the Member to (a) an interest in the Net Income, Net Loss, Distributable Cash, and net proceeds of liquidation of the Company as such interest pertains to trading commissions and performance bonuses derived from currency trading activities of Conundrum Capital LLC, as set forth herein; (b) any right to vote as set forth herein or as required under the Act; and (c) any right to participate in the management of the Company as set forth herein or as required under the Act. A Membership Interest is personal property and a Member shall have no interest in the specific assets or property of the Company. The number of Units currently authorized is 3 Units (par value shall be $300,000.00 USD per Unit to the extent a par value determination is required or desired). Each Unit shall be paid for in cash or such other form of consideration as the Managing Member may reasonably determine in his reasonable discretion. Initial units will be distributed by the Managing Member at his sole discretion. Under this agreement Jordan Serlin has been assigned 2 Units, and ***GDR Privée*** as represented by Charles Grégoire de Rothschild has been hereby issued 1 Unit. The unit held by ***GDR Privée*** cannot be diluted. If additional Units are ever issued, ***GDR Privée*** will be maintained at a 33.33% Membership vote and ownership standing at no additional cost to ***GDR Privée***, and would automatically be issued any additional Units required to maintain said 33.33% Membership position within Conundrum Capital LLC.

**Membership Percentage** means, with respect to each Member, such Member's percentage ownership of the total outstanding Units of the Company set forth on Exhibit A attached hereto, as may be amended or adjusted from time to time.

**Minimum Gain** shall mean the minimum gain, determined by computing, with respect to each non-recourse liability, the amount of gain (of whatever character), if any, that would be realized if the Company disposed of (in a taxable transaction) the property subject to such





liability in full satisfaction thereof (and for no other consideration), and by then aggregating the amounts so computed. Minimum Gain shall be computed in all respects in conformity with the Regulations. Without limiting the generality of the foregoing, all definitions relevant for Minimum Gain purposes shall have the meaning ascribed thereto in, or for purposes of, the Regulations.

**Net Income** or **Net Loss** shall mean the income or loss for federal income tax purposes determined as of the close of the Company's Fiscal Year or as of such other time as may be required by this Agreement or the Code, as well as, where the context requires, related federal tax items such as tax preferences and credits, appropriately adjusted with respect to final determination of any of the foregoing for federal income tax purposes, and also adjusted as follows:

(a) Any income that is exempt from federal income tax and not otherwise taken into account in computing Net Income or Net Loss shall be added to such taxable income or loss.

(b) Any expenditures described in Section 705(a)(2)(B) of the Code, or treated as Section 705(a)(2)(B) expenditures pursuant to Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Income or Net Loss shall be subtracted from such taxable income or loss.

(c) In lieu of depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year or other period.

(d) Gain or loss during any Fiscal Year on account of the sale, exchange, condemnation or other disposition of any assets, as determined in accordance with Section 1001 of the Code (or, where applicable, Section 453 of the Code), appropriately adjusted, however, with respect to final determination of the foregoing for federal income tax purposes, and also adjusted as follows:

(i) in the event the Gross Asset Value of any asset is adjusted pursuant to subparagraphs (b) or (c) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as though the same constituted gain or loss from the disposition of such asset for purposes of computing Net Income or Net Loss under the provisions of this Agreement.

(ii) gain or loss, if any, resulting from any disposition of Company assets with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value.

**Nonrecourse Deductions** has the meaning set forth in Regulation Section 1.704-2(b)(1).

**Nonrecourse Liability** has the meaning set forth in Regulation Section 1.704-2(b)(3).

**Person** means any natural person or Entity.






**Regulation or Regulations** means the proposed, temporary and final regulations promulgated by the Treasury Department pursuant to the Code, as amended from time to time.

**Transfer** means assign, sell, pledge, encumber, give or otherwise transfer, dispose of or alienate, or grant an option or contractual agreement to do any of the foregoing, but shall not include any transfer to a legal representative or successor trustee.

**Units** mean the Membership Interests in the Company, consisting of 3 total Membership Units.

1.2 **Other Defined Terms.**

Capitalized terms not defined in Section 1.1 shall have the meanings set forth in the other sections of this Agreement.

1.3 **References.**

References to an exhibit or to a schedule are, unless otherwise specified, to one of the exhibits or schedules attached to this Agreement, and references to an article or a section are, unless otherwise specified, to one of the articles or sections of this Agreement. Each exhibit and schedule attached hereto and referred to herein is hereby incorporated herein by such reference.

## ARTICLE II - ORGANIZATION

2.1 **Organization of Company.**

Upon the filing of the Articles of Organization with the Secretary of State of the State of Florida, the Entity named in the preamble to this Agreement hereby forms the Company as a limited liability company governed by the terms hereof. Except as provided herein or in the Articles of Organization, the rights and obligations of the Members are as provided under the Act.

2.2 **Name.**

The name of the Company is "Conundrum Capital LLC" or such other name as may be selected by the Members.

2.3 **Purpose; Character of the Business.**

The purpose and business of the Company is to engage in any lawful business or activity permitted by the Act (the "Business"). The principal business of Conundrum Capital LLC is the automated trading of Dollar / Euro currencies on the FOREX exchange via GAIN Capital / Forex.com UK on a customer managed account basis.

2.4 **Principal Office.**



The location of the Company's principal executive office is 17076 Boca Club Blvd, Suite #5, Boca Raton, Florida 33487, or such other place as may be selected by a Majority in Interest of the Members.





2.5 **Registered Agent and Registered Office.**

The statutory agent for service of process and the registered office of the Company in the state of Florida shall be Jordan Serlin, 17076 Boca Club Blvd, Suite #5, Boca Raton, Florida 33487, or such other statutory agent and registered office as a Majority in Interest of the Members may determine from time to time.

2.6 **Registered Members.**

The Company shall be entitled to recognize the exclusive right of a person registered on its books as the owner of Units to receive distributions, and to vote or take other action as such owner, and to hold liable for calls and assessments a person registered on its books as the owner of Units, and shall not be bound to recognize any equitable or other claim to or interest in such Units on the part of any other Person.

2.7 **Members.**

The Members named in the preamble to this Agreement have been admitted to the Company as initial Members. The names and mailing addresses of the Members are set forth in Exhibit A attached hereto and incorporated herein by reference, as the same may be amended from time to time. GDR Privee is not licensed by the SEC or FINRA. In relation to licensing, Conundrum Capital LLC has already acquired or will seek appropriate licensing on the behalf of the LLC for operational purposes, as the need arises.

Member information such as photographs, biographies, or other personal information cannot be utilized by Conundrum Capital LLC without the express written permission of the specific Member in question. Such permission has been hereby granted by Jordan Serlin, and GDR Privee as represented by Charles Grégoire de Rothschild.

The membership interest of GDR Privee as represented by Charles Grégoire de Rothschild shall be understood to be non-cancellable as the said membership interest has been fully invested at a 33.33% pro rata share of the total membership interest in Conundrum Capital LLC. Further said membership interest of GDR Privee as represented by Charles Grégoire de Rothschild is non-refundable to the interest holder.

2.8 **Limited Liability.**

Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and the Members shall not be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a member of the Company.






2.9 Scope of Members' Authority.

Unless otherwise expressly provided in this Agreement, no Member shall have any authority to act for, or assume any obligations or responsibility on behalf of the Company or any other Member. Nothing contained herein shall constitute the Members as partners with one another in any matter (other than for federal income tax purposes) or render any of them liable for the debts or obligations of any other Member.

## ARTICLE III - CAPITAL CONTRIBUTIONS

3.1 Initial Capital Contributions.

The initial Capital Contribution of each of the Members named in the preamble to this Agreement shall be made in the form and amount as set forth on Exhibit A attached hereto.

3.2 Withdrawal; Return of Capital; Interest.

Except as specifically provided herein, no Member shall be entitled to any distributions from the Company or to withdraw any part of such Member's Capital Contribution prior to the Company's dissolution and liquidation, or when such withdrawal of capital is permitted, to demand distribution of property other than money. No Member shall be entitled to interest on his/her/its Capital Contribution.

3.3 Waiver of Appraisal Rights.

Each of the Members hereby agrees that no Member shall have any appraisal rights whether pursuant to the Act or otherwise.

3.4 Obligation to Make Additional Capital Contributions.

Members shall not be obligated to make any additional Capital Contributions subsequent to their respective initial Capital Contributions.

## ARTICLE IV - ALLOCATION OF NET INCOME AND NET LOSS, ETC.

4.1 Net Income and Net Loss.

Net Income and Net Loss for any Fiscal Year or other applicable period shall be allocated among the Members in accordance with and in proportion to their respective Membership Percentages. Net income will be paid monthly: 2/3 to Jordan Serlin and 1/3 to ***GDR Privée***. Net income will be based on the profits derived from commissions and performance bonuses generated from managed currency trading accounts assigned to Conundrum Capital LLC. Any other revenue generating activities such as direct investments into RTO or IPO transactions, and any finder's fees therein will be allocated to the Members on a case-by-case basis as defined in







writing for each engagement.

4.2 **Special Allocations.**

(a) Company Minimum Gain Chargeback. Notwithstanding any other provision of this Article IV, if there is a net decrease in Company Minimum Gain during any taxable year or other period for which allocations are made, prior to any other allocation under this Agreement, each Member will be specially allocated items of income and gain relating to that period (and, if necessary, subsequent periods) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Minimum Gain during such year as determined in accordance with Regulation Section 1.704-2(g)(2). The items to be allocated will be determined in accordance with Regulation Section 1.704-2(f).

(b) Member Nonrecourse Debt Minimum Gain Chargeback. Notwithstanding any other provision of this Article IV, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation Section 1.704-2(i)(4).

(c) Qualified Income Offset. A Member who unexpectedly receives any adjustment, allocation or distribution described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of income and gain in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

(d) Gross Income Allocations. Each Member who has an Adjusted Capital Account Deficit at the end of any Fiscal Year will be specially allocated, as quickly as possible, items of gross income and gain in the amount of such deficit.

(e) Nonrecourse Deductions. Nonrecourse Deductions for any Fiscal Year or other period for which allocations are made will be allocated among the Members in proportion to their respective Membership Percentages.

(f) Member Nonrecourse Deductions. Notwithstanding anything to the contrary in this Agreement, any Member Nonrecourse Deductions for any Fiscal Year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which the Member Nonrecourse Deductions are attributable in accordance with Regulation Section 1.704-2(i).

(g) Code Section 754 Adjustments. To the extent an adjustment to the adjusted tax






basis of any Company asset under Code Sections 734(b) or 743(b) is required to be taken into account in determining Capital Accounts under Regulation Section 1.704-1(b)(2)(iv)(m), the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis), and the gain or loss will be specially allocated to the Members in a manner consistent with the manner in which their Capital Accounts are required to be adjusted under Regulation Section 1.704-1(b)(2)(iv)(m).

(h) Interest in Company. Notwithstanding any other provision of this Agreement, no allocation of Net Income or Net Loss or item of Net Income or Net Loss will be made to a Member if the allocation would not have economic effect under Regulation Section 1.704-1(b)(2)(ii). The Tax Matters Partner, upon advice of independent tax counsel to the Company and with the consent of the Managing Member, will have the authority to reallocate any item in accordance with this Section 4.2(h).

(i) Corrective Allocations. If the Company is required by Sections 4.2(c), (d), (f) and (h) above to make an allocation in a manner less favorable to the Members than is otherwise provided for in this Article IV, the Company shall, upon the advice of the Company's independent tax counsel that they are so permitted under Section 704(b) of the Code and the Regulations thereunder or other Code provisions, allocate Net Income or Net Loss arising in later Fiscal Years so as to bring the allocations of Net Income or Net Loss to the Members as nearly as possible to the allocations thereof otherwise contemplated by this Article IV as if such allocation were not made.

## 4.3 Tax Allocations.

In accordance with Code Section 704(c) and the Regulations thereunder, income, gain, loss, and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value in accordance with the traditional method set forth in Regulation Section 1.704-3(b) (1). For purposes of this Section 4.3, contributions of property by a Member shall be aggregated to the extent permitted pursuant to Section 1.704-3(e) (1) of the Regulations. Any recapture of depreciation pursuant to Sections 1245 or 1250 of the Code shall be allocated to the Members which realized the benefit of the deductions attributable to such recapture.

## 4.4 Effect on Allocations of New Members or Assignees.

In the event that new Members are admitted to the Company or persons become Assignees on other than the first day of any Fiscal Year, Net Income and Net Loss for such Fiscal Year shall be allocated among the Members and Assignees in accordance with Code Section 706, using any convention permitted by law and selected by the Company.

## 4.5 Tax Withdrawal.






The Company shall be authorized to pay on behalf of any Member, any amounts to any federal, state, provincial, territorial, local or foreign taxing authority, as may be necessary for the Company to comply with tax withholding provisions of the Code or other applicable income tax or revenue laws of any taxing authority. To the extent the Company pays any such amounts that it may be required to pay on behalf of a Member, such amounts shall be treated as a distribution to such Member and shall reduce the amount otherwise distributable to such Member. To the extent any amount so withheld exceeds the cash otherwise distributable to such Member, such expense shall be deemed a loan to the Member bearing interest at the prime rate as reported from time to time in the Wall Street Journal or, in the event publication of the Wall Street Journal is terminated, in such successor national financial publication as determined by the Members, payable out of any future distributions, and if not earlier repaid upon termination of the Company or the sale or other disposition of all or a portion of such Member's Units.

4.6 **No Effect on Distributable Cash.**

The provisions of this Article IV shall have no relevance whatsoever for purposes of determining each Member's share of the Company's Distributable Cash or liquidation proceeds.

## ARTICLE V - DISTRIBUTIONS

Distributable Cash, if any, shall be distributed at such times and from time to time as the Managing Member may determine in his sole discretion, pro rata among the Members in accordance with their applicable Membership Percentages. The Percentages are defined in Exhibit A of this document.

## ARTICLE VI - ACCOUNTING AND ADMINISTRATIVE MATTERS

6.1 **Books and Records.**

The Company will maintain true, complete and correct books of account of the Company, all in accordance with generally accepted accounting principles applied on a consistent basis. The books of account shall contain particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Business, and all of such other transactions, matters and things relating to the business of the Company as are usually entered in books of accounts kept by persons engaged in a business of a like kind and character. In addition, the Company shall keep all records required to be kept pursuant to the Act. Any Member shall, upon prior written notice and during normal business hours, have access to the information described in Section 608.4101of the Act, for the purpose of inspecting or, at the expense of such Member, copying the same. Any Member reviewing the books and records of the Company pursuant to the preceding sentence shall do so in a manner which does not unduly interfere with the conduct of the business of the Company and the Managing Member.

6.2 **Reports.**






The Company shall prepare, or cause to be prepared, and shall furnish to each Person who was a Member during a Fiscal Year, within 120 days after the close of such Fiscal Year, (a) Financial Statements for such Fiscal Year and (b) a Schedule K-1 or such other form as shall be necessary to advise all Members relative to their investment in the Company for federal, state, local, provincial, territorial and foreign income tax reporting purposes.

6.3 **Tax Matters Partner**.

The Managing Member shall be the "Tax Matters Partner" as such term is defined in Section 6231(a)(7) of the Code.

6.4 **Tax Elections**.

All elections required or permitted to be made by the Company under any applicable tax laws shall be made by the Managing Member.

6.5 **Reimbursement**.

The Company shall reimburse the Managing Member for reasonable out-of-pocket costs incurred in connection with, or allocable to, performance of his duties under this Agreement.

## ARTICLE VII - MANAGEMENT OF COMPANY

7.1 **Members; Rights, Power and Authority; Managing Member Authority**.

Except as specifically provided herein, the management and control of the Company shall be vested in Jordan Serlin as the Managing Member. The Managing Member shall be responsible for the establishment of policy and operating procedures respecting the business affairs of the Company and the day to day operations of the Company's business. Subject to the provisions of Section 7.3 hereof, the Managing Member shall have the power and authority to take any actions not prohibited under the Act or which are otherwise conferred or permitted by law, which he/they believe(s) is/are necessary, proper, advisable or convenient to the discharge of his/their duties under this Agreement or applicable law to conduct the business and affairs of the Company, including, but not limited to, the power and authority to execute agreements and other documents on behalf of the Company. Except as provided in Section 7.3 hereof, with respect to those matters specifically reserved to the Members, the Managing Member shall have the right, power and authority to take the following actions:

(i) Operate the Business in the ordinary course and execute and deliver such agreements, documents and instruments as the Managing Member deems reasonably necessary or appropriate in connection therewith;







(ii) Protect and preserve the titles and interests of the Company with respect to the assets owned by or dedicated to the Company;

(iii) Keep all books of account and other records of the Company, in accordance with the terms of this Agreement;

(iv) Carry out the responsibilities of the Company under the management, operating, leasing and other contractual agreements to which it is a party;

(v) Prepare and file all necessary reports, statements, tax returns and other documents with local, state, federal or foreign agencies or departments in connection with the Business;

(vi) Procure and maintain insurance of such types and in such amounts as the Managing Member deems reasonable in his sole discretion;

(vii) Employ, retain and enter into business relationships with, on behalf of the Company, accountants, attorneys and other professionals and consultants, including, subject to Section 7.17 hereof, those affiliated with or employed by a Member, necessary or appropriate to carry out the Business;

(viii) Determine and prepare on an annual basis, all operating and other budgets for the Business;

(ix) Comply with all laws, ordinances, orders, rules, regulations and other requirements of all federal, state, local, provincial, territorial and foreign governments, courts, departments, commissions, boards and officers;

(x) To the extent that funds of the Company are available from time to time, pay all current debts and other obligations of the Company;

(xi) Make, execute and deliver, on behalf of the Company, any promissory note, mortgage, deed of trust, security agreement, guarantee, indemnity bond, surety bond, accommodation paper or other instrument to evidence any debt or obligation, and/or renewal or extension of any of the foregoing, which has been approved by the Members; and

(xii) Obtain and maintain, in the name of each Member and the name of the Company, as may be required by applicable law, such licenses, permits and other governmental authorizations as are necessary for the lawful conduct of the Company's business.

Delegation of Powers; Officers. The Managing Member may delegate his powers, but not his responsibilities, to the employees or affiliates of any Member or to any other Person. The Managing Member may designate one or more officers of the Company (the "Officers"), with such authority, powers and duties as the Managing Member shall determine from time to time.







Initially, Jordan Serlin is designated as the Company's Chief Executive Officer, President, Treasurer and Secretary. Officers need not be Members or affiliated with any Member. Any Officer may be removed or replaced, with or without cause, at the discretion of the Managing Member or a Majority in Interest of the Members, and vacancies may be filled or new offices created and filled by the Managing Member or a Majority in Interest of the Members. An Officer of the Company may receive compensation for services rendered to the Company by such person in such capacity. An Officer may resign at any time by delivering notice to the Company, such resignation to be effective when such notice is delivered, unless the notice specifies a later effective date. The removal of any Officer shall be without prejudice to the contract rights, if any, of the person so removed; provided however, that the appointment of an Officer shall not, of itself, create contract rights in the person appointed. The resignation of an Officer shall not affect the Company's contract rights, if any, with such officer.

7.2 **Resignation of the Managing Member.**

The Managing Member may resign at any time by giving written notice to the Members (the "Resignation Notice"). The resignation of a Managing Member shall take effect thirty (30) days after the Resignation Notice is given or at such earlier time as accepted by a Majority in Interest of the Members and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.

If a Managing Member shall die, be adjudged incompetent, dissolve, refuse to serve, be removed or resign, or if no one is serving as the Managing Member for any reason, then a new Managing Member shall be elected by the affirmative vote of owning a Majority in Interest of the Members. The resignation of the Managing Member shall not affect the Managing Member's rights as a Member and shall not constitute the Managing Member's withdrawal as a Member.

7.3 **Actions Requiring Member Approval.**

Notwithstanding anything in this Agreement to the contrary, except as set forth in the definition of the term "Membership Interest," no action shall be taken, sum expended, decision made or obligation incurred with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"), unless such Major Decision has been approved by a Majority in Interest of the Members. The Major Decisions are:

(a) selling, exchanging, assigning, leasing, mortgaging, pledging or otherwise transferring, encumbering or disposing of any property of the Company other than in the ordinary course of business;

(b) Borrowing money or incurring or refinancing indebtedness in the name of the Company or guaranteeing the obligations of another party other than in the ordinary course of business;

(c) Lending money or extending credit to anyone other than in the ordinary course of





business;

(d) Requiring additional Capital Contributions of the Members;

(e) Amending, modifying, waiving or repealing any provisions of this Agreement, except as otherwise contemplated in this Agreement;

(f) Reorganizing the Company or causing the Company to merge or consolidate with or into another Entity or acquiring another Entity or substantially all the assets of another Entity;

(g) Except as provided in Section 10.1 hereof, dissolving or liquidating the Company;

(h) Selecting the Liquidating Trustee; and

(i) Materially modifying, changing or amending any agreement or arrangement which is the subject of the matters referred to in this Section.

Except as set forth in this Article VII, or otherwise in this Agreement, no Member, acting individually, nor any of their respective Affiliates, has the power or authority to bind the Company, or any other Member or to authorize any action to be taken by the Company, or to act as agent for the Company or any other Member, unless that power or authority has been specifically delegated or authorized by action of the Members.

## 7.4 Removal of the Managing Member.

The decision of whether to remove the Managing Member, choose a successor, or, in the alternative, to procure the assistance of an independent firm to perform management of the day to day affairs of the Company and/or the Company business will be left to the sole discretion of the Members who may, by vote of a Majority in Interest of the Members, elect to undertake any of these alternatives or another of their choosing.

## 7.5 Duties and Obligations of the Members.

7.5.1 The Members shall take all actions which may be necessary or appropriate for the continuation of the Company's valid existence as a company under the laws of the State of Florida.

7.5.2 Each of the Members shall devote to the Company such time as may be necessary for the proper performance of his/her/its duties hereunder. Nothing herein shall prohibit the Members and their respective Affiliates from engaging in any other business activities during the term of the Company, and nothing shall give the other Members any interest in any such competitive activities.

7.5.3 The Members shall, in connection with the performance of their duties hereunder,






comply, and shall cause the Company to comply, in all respects with the laws of the United States, the State of Florida and any other applicable jurisdiction, and with the rules and regulations of any government promulgated thereunder.

7.6 **A Member's Duty of Loyalty.**

Each Member agrees: (a) to account to the Company and hold as trustee for the Company any property, profit or benefit derived by such Member in the conduct and winding up of the Company business or derived from the use by the Member of Company property, including the appropriation of a Company opportunity, and (b) to refrain from dealing with the Company in the conduct or winding up of the Company business on behalf of a party having an interest adverse to the Company.

7.7 **Member Meetings.**

An annual meeting of the Members shall be held, with notice on such date as may be selected by the Managing Member. The Managing Member or a Majority in Interest of the Members may call special meetings of the Members. Member meetings shall be chaired by the Managing Member or President.

7.8 **Notice.**

Notice of a special meeting shall be given to each Member not less than ten (10) days nor more than sixty (60) days prior to the date designated therein for such meeting. The notice should state the time and place of the special meeting and the purpose(s) for which such meeting is called, and shall be hand delivered or mailed to each Member, at the address of such Member as it appears on the books of the Company or, if such Member has filed with the Company a written request that notices be mailed to some other address, then to the address designated in such request.

7.9 **Quorum and Voting.**

A Majority in Interest of the Members shall constitute a quorum if present in person or by proxy. For any act for which the vote of the Membership is taken, the vote of the Members owning a majority of the outstanding Units shall be the act of the Company. For actions on which the Members will vote, no action may be taken at a meeting of the Members unless a quorum is present.

7.10 **Proxies.**

At any meeting of the Members, a Member may vote by proxy executed in writing by the Member or by his or her duly authorized attorney in fact. Such proxy shall be filed with the Company before or at the time of the meeting. Unless otherwise provided therein, a proxy shall not be valid more than three years after the date of its execution, unless the proxy provides for a longer period.





7.11 **Waiver of Notice.**

Whenever written notice is required to be given to the Member, a written waiver thereof signed by the Member entitled to such notice (whether, in the case of notice of a meeting, the written waiver thereof is signed before or after the meeting) shall be in all respects tantamount to notice. Attendance of a Member at a meeting of the Members shall constitute a waiver of notice of such meeting, except where a Member attends a meeting for the express purpose of objection to the transaction of any business on the grounds that the meeting is not lawfully called or convened.

7.12 **Telephonic Meetings.**

Any meetings of the Members may be held, or any Member may participate in any meeting of the Members, by use of a conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other and communicate with each other.

7.13 **Compensation; Reimbursement of Expenses.**

The Managing Member shall be entitled to receive such compensation for his services to the Company as the Managing Member and/or as an officer of the Company as he shall in his sole discretion reasonably determine. No other Member shall receive compensation for their services to the Company in such capacity, unless agreed to in writing by the majority of the Members. The Company shall reimburse the Managing Member for all costs and expenses incurred by the Managing Member in or related to the performance of his duties to the Company.

7.14 **No Authority of Individual Member.**

Except as set forth in this Agreement, no Member, acting individually, or any of their respective Affiliates, has the power or authority to bind the Company, or any other Member or to authorize any action to be taken by the Company, or to act as agent for the Company or any other Member, unless that power or authority has been specifically delegated or authorized by action of the Members.

7.15 **Presumption of Assent.**

A Member who is present at a meeting of the Members shall be conclusively presumed to have assented to any action taken unless his dissent shall be expressed at such meeting and entered in the minutes of the meeting.

7.16 **Decision of Members by Written Consent.**







Any action to be made by the Members may be taken without a meeting if consent in writing, setting forth the action so taken, is signed by the Members owning the number of Units otherwise required for taking such action. Within ten days after such authorization by written consent, notice must be given to those Members who have not consented in writing or are not entitled to vote on the action.

7.17 **Related Party Transactions.**

The Company may engage in transactions with Members or their Affiliates; provided, however, that (a) the Members are made aware of the material facts as to the relationship of the party to the Company and the contract or transaction is specifically approved or ratified in good faith by vote of a Majority in Interest of the non-affiliated or disinterested Members or (b) the contract or transaction is fair as to the Company as of the time it is executed and delivered.

7.18 **Confidentiality**

Each Member, other than the Managing Member, agrees and acknowledges that he/she/it has executed or will execute concurrent with the execution of this Operating Agreement a **Confidentiality Agreement.**

Each Member further agrees and acknowledges to be bound by the terms of such Agreement, which Agreement provides, in pertinent part, that each Member maintain any Confidential Information (as such term is defined below) disclosed to such Member on a confidential basis.

**[The Agreement further provides that "Confidential Information" shall mean any data or information in whatever form, including but not limited to information about the Company and its current and planned business operations as set forth in herein and via exhibits, as same may be amended that is of value to the Company and is not generally known to the respective competitors of the Company and/or not generally known to the public, including but not limited to the Company's present, planned and future trade practices, trade secrets, any and all client and supplier information (including, but not limited to client lists and vendor agreements),software, management agreements, personnel information, financial information, price lists, pricing policies, business methods, and contract and contractual relations with the Company's current or prospective clients and suppliers, as any and all of the foregoing may be updated, revised and /or amended from time to time following the date hereof.]**

## ARTICLE VIII - LIMITATION ON LIABILITY AND INDEMNIFICATION

8.1 **Exculpation of Liability.**

No Member, including the Managing Member, or any of his Affiliates, or any Officer, director, shareholder, partner, principal, employee or agent of the Company or of the foregoing





(each, an "Exculpated Party"), shall be liable, in damages or otherwise, to the Company or to any of the Members for any act or omission by any such Exculpated Party pursuant to the authority granted by this Agreement, unless such act or omission results from fraud, gross negligence, or willful misconduct. The Company shall indemnify, defend and hold harmless each Exculpated Party from and against any and all claims or liabilities of any nature whatsoever, including reasonable attorneys' fees, arising out of or in connection with any action taken or omitted by an Exculpated Party pursuant to the authority granted by this Agreement or otherwise, except where attributable to the fraud, gross negligence, or willful misconduct of such Exculpated Party. Each Exculpated Party shall be entitled to rely on the advice of counsel, public accountants or other independent experts experienced in the manner at issue, and any act or omission of such Exculpated Party pursuant to such advice shall in no event subject such Exculpated Party to liability to the Company or any Member.

8.2 **Liability of Exculpated Parties and Members.**

(a) In carrying out their respective powers and duties hereunder, each Exculpated Party (as defined in Section 8.1 above) shall exercise his/her/its best efforts and shall not be liable to the Company or to any Member for any actions taken or omitted to be taken in good faith and reasonably believed to be in the best interest of the Company or for errors of judgment made in good faith.

(b) A Member who ceases to be a Member shall not be liable for or on account of obligations or liabilities of the Company incurred subsequent to such Person ceasing to be a Member.

8.3 **Indemnification of the Managing Member and Members.**

In any pending or completed action, suit, or proceeding to which the Managing Member or any of his Affiliates (which for purposes of this Section shall include in each case the officers, directors, shareholders, partners, principals, employees, or agents of the foregoing) or other Member is or was a party by reason of the fact that such Managing Member or Affiliate or other Member (a) is or was the Managing Member, or (b) is an Affiliate of the Managing Member, the Company shall hold harmless and indemnify such Managing Member or Affiliate or other Member harmless from and against any and all losses, harm, liabilities, damages, costs, and expenses (including, but not limited to, reasonable attorneys' fees, judgments, and amounts paid in settlement) incurred by the Managing Member or Affiliate or other Member in connection with such action, suit, or proceeding if the Managing Member or Affiliate or other Member determined in good faith, that the course of conduct which caused the loss or liability was in the best interests of the Company, and provided that such Managing Member's or Affiliate's or Other Member's conduct does not constitute fraud, gross negligence, willful misconduct, or breach of fiduciary duty to the Members or the Company.

All Members agree that they will never bring any lawsuit or other claim or action against GDR or Charles Gregoire de Rothschild or Jordan Serlin, or Conundrum Capital LLC, for any






reason and under any circumstances. Should this prohibition be deemed against public policy, then the total liability to any Member for any reason associated with or arising under this Agreement will be limited to One Thousand U.S. Dollars (US$1,000). The only allowed exception will be if the Managing Member (Jordan Serlin currently), does not distribute net profits to the Members as indicated by this agreement, and if said net profits owed to a Conundrum Capital LLC Member exceed One Thousand U.S. Dollars (US$1,000).

8.4 **Advancement of Legal Costs and Expenses.**

The Company shall advance Company funds to the Managing Member or its Affiliates for legal expenses and other costs incurred as a result of any legal action if the following conditions are satisfied: (a) the legal action relates to acts or omissions with respect to the performance of duties or services on behalf of the Company; (b) the legal action is initiated by a third party who is not a Member, or the legal action is initiated by a Member; and (c) the Managing Member or its Affiliates undertake to repay the advanced funds, together with interest at the rate of prime plus 1%, to the Company in cases in which the Managing Member or such Affiliates are not entitled to indemnification under this Article.

8.5 **Provisions Not Exclusive.**

The exculpation of liability and indemnification provided by this Article shall not be deemed exclusive of any other limitation on liability or rights to which those seeking indemnification may be entitled under any statute, agreement, vote of Members or otherwise.

8.6 **Insurance.**

The Company may purchase insurance to insure against the liabilities contemplated by this Article VIII.

## ARTICLE IX - TRANSFER OF MEMBERSHIP INTERESTS; PURCHASE OPTION UPON DEATH, BANKRUPTCY

9.1 **Transfer; First Right of Refusal.**

(a) Except as otherwise specifically set forth in this Agreement, the Members (excluding, however, the Managing Member) may Transfer their Units only after a twelve month holding period and only upon the approval in the sole discretion of and without any liability to the Managing Member. Notwithstanding anything herein to the contrary, all Transfers will be in compliance with the Securities Act of 1933, as amended, and applicable state securities laws as determined by the Company and its securities counsel. As used in this Article, the term "Transfer" shall mean and include a Transfer of all or any portion of any holder of any ownership, voting, or beneficial interest in a Unit owned by a Member such that this Article shall apply to any disposition, alienation or encumbrance of any capital stock or other equity, voting or






other beneficial interest in a Member. Any purported Transfer, no matter how effected, which does not comply with the terms, conditions and procedures of this Agreement shall be null and void and shall not result in a transfer of any interest in the Company.

(b) Notwithstanding the foregoing, if a Member (the "Selling Party") receives a bona fide written offer to purchase all, but not less than all, of such Member's Units in the Company ("Third Party Offer"), and such Selling Party desires to sell all, but not less than all, of such Member's Units in the Company, the Selling Party shall first give written notice to the Managing Member stating that the Selling Party desires to sell all of its Units in the Company (the "Offered Interest") for the price and pursuant to the terms of the Third Party Offer, a full description of which shall be attached to the notice. The Managing Member shall have the option to purchase in proportion to his relative Membership Percentage all, but not less than all of the Offered Interest at a purchase price equal to the lower of the price contained in the Third Party Offer or the fair market value of the Units and otherwise in accordance with terms substantially equivalent to those terms set forth in the Third Party Offer, such option to be exercised by delivery of written notice of acceptance to the Selling Party within twenty (20) Business Days from the Managing Member's receipt of the notice and description of the Third Party Offer. (The fair market value of such Units shall be determined by the Company's then accounting firm, which determination shall be conclusive and binding on the parties hereto. In the event the Company's then accounting firm cannot or will not make such determination, then the Company shall retain the services of an appraiser at its expense to make such determination. In the event the Member proposing the Transfer is dissatisfied with such determination, such Member may at his/her/its expense retain the services of another appraiser to make such determination. Should there be a difference between the two determinations of fair market value; the Company and the Member proposing the Transfer agree that the fair market value shall be equal to the average of such two determinations.) If, at the expiration of the twenty (20) Business Day period, the Managing Member has not exercised his option to purchase all of the Offered Interest, then the Selling Party shall be free to sell the Offered Interest to the Person named in the Third Party Offer provided that such sale is on the same terms and conditions as set forth in the Third Party Offer, such sale is consummated within ninety (90) days following the giving of notice of the Third Party Offer to the Managing Member and such sale complies in all respects with applicable federal and state securities laws. In the event the sale is to be consummated on terms other than as set forth in the Third Party Offer, such terms shall be deemed to be a new Third Party Offer which must be offered to the Managing Member in accordance with this paragraph.

9.2 <u>Transferees as Substitute Members; New Members</u>.

Notwithstanding any Transfer which may be permitted in accordance with the provisions of this Article IX, no Person, not then a Member, to whom (a) Unit(s) shall be Transferred in accordance with the provisions of this Article IX or other than in accordance with this Article IX shall be admitted as a substituted Member unless (a) such transferee shall agree in writing to be subject to the terms hereof and shall become a substituted Member hereunder, and (b) such transferee and the transferor otherwise complies with any other documentary requirements reasonably imposed by the Managing Member or a Majority in Interest of the Members (other






than the transferor). All reasonable costs and expenses incurred by the Company in connection with any Transfer, and, if applicable, the admission of a Person as a substituted Member, shall be paid by the transferor. In the event a transferee of a Unit is not admitted as a substituted Member, such transferee shall be deemed a mere assignee of profits only without any right, power or authority of a Member hereunder and shall bear losses in the same manner as its predecessor in interest, and the transferor of such interest shall thereafter be considered to have no further rights or interest in the Company with respect to the interest Transferred, but shall nonetheless be subject to its obligations under this Agreement with respect to such interest. Additionally, the Membership Interest of such transferor shall be a defaulted interest and such transferor shall have no right to vote with respect to any Company matter (a "Defaulted Member"). Upon admission of a transferee as a substituted Member, the transferor shall withdraw from the Company, and be relieved of any corresponding obligations, to the extent of its Transferred Units.

9.3 **Terms of Admission of New Members; Creation of Preferred or Special Interests.**

Except as otherwise set forth in this Article IX, the Managing Member shall have the right, in his sole discretion, to admit new Members by issuing one or more of the available Units authorized to be issued in exchange for property, cash or services only upon the consent of a Majority in Interest of the Members, and the Managing Member shall determine the amount and nature of contributing by new Members admitted on such terms as the Managing Member may determine. A Majority in Interest of the Members may create, out of such authorized Units, series or classes of Units or groups of Members (including existing Members) having such relative rights, powers and duties as a Majority in Interest of the Members may from time to time approve and establish. The Managing Member may amend Exhibit A hereto to reflect changes in ownership of Units and Membership Percentages resulting from the issuance of Units in exchange for any such property, cash or services or resulting from the redemption of Units.

9.4 **Death, Incapacity, Bankruptcy or Insolvency of a Member; Purchase Option.**

(a) If a Member dies or becomes incapacitated, his or her Membership Interest may pass to his or her estate or legal representative as a transfer without consideration pursuant to Sections 9.1 (a) and 9.2. If a Member becomes a Bankrupt Member, the Managing Member shall forthwith become vested with the exclusive right and option, to be exercised in writing to such Bankrupt Member, for a period of ninety (90) days after the Managing Member has received written notice from the Bankrupt Member of the occurrence of any Event of Bankruptcy (which notice shall be delivered within three (3) Business Days after such occurrence), to elect to purchase the entire interest of the Bankrupt Member at a purchase price determined in accordance with subsection (c) of this Section 9.4.

(b) A Bankrupt Member (or its legal representative) whose entire right, title and interest is to be purchased and succeeded to by the Managing Member pursuant to this Section 9.4 shall, within ten (10) days after receipt of notice from the Managing Member of his intent to purchase the entire interest of the Bankrupt Member, execute and deliver such deeds, bills of sale







and other instruments as shall reasonably be requested by the Managing Member to effect the conveyance and transfer of the entire right, title and interest of such Bankrupt Member in the Company, and shall, to the extent requested by the Managing Member, cooperate to effect a smooth and efficient continuation of the Company affairs. If the Bankrupt Member (or its legal representative) disputes the right of the Managing Member to purchase and succeed to the Bankrupt Member's entire right, title and interest in the Company, such Bankrupt Member (and its legal representative) shall nevertheless execute instruments and cooperate with the Managing Member pursuant to the immediately preceding sentence, without, however, being deemed to have waived his or its rights to damages if the Managing Member shall have purchased and succeeded to the interest of the Bankrupt Member under this Section 9.4 without having the right to do so.

(c) Upon compliance by the Bankrupt Member with the provisions of the immediately preceding subsection (b) of this Section 9.4, the Managing Member succeeding to the entire right, title and interest of the Bankrupt Member in the Company shall pay to such Member or his legal representative the "Fair Value" thereof (such value to be determined as of the date the Managing Member serves notice on the Bankrupt Member of his intent to purchase such Member's interest) within ninety (90) days thereafter. The "Fair Value" of the Company and of the interest of the Bankrupt Member therein shall be determined pursuant to paragraph (d) below.

(d) In the event the "Fair Value" of the Company and of the Bankrupt Member's interest therein, is to be determined pursuant to this Section 9.4 or any other provision of this Agreement or the Act, "Fair Value" shall be determined by agreement of the Bankrupt Member (or its legal Representative), and the Managing Member, or, if agreement cannot be reached, by the median appraisal of two independent appraisers, one to be chosen by the Bankrupt Member (or its legal representative), and one to be chosen by the Managing Member. The cost of each appraiser shall be paid by the party choosing such appraiser.

## ARTICLE X - DISSOLUTION AND TERMINATION

### 10.1 Dissolution.

The Company shall continue in effect until dissolved upon the first to occur of the following:

(a) The approval of a Majority in Interest of the Members to dissolve the Company;

(b) The entry of a decree of judicial dissolution of the Company under Section 608.441(2) of the Act or such other event requiring dissolution under the Act; or

(c) Sale or other disposition of all or substantially all of the Company's assets, other than: (i) in the usual and regular course of the Company's business; and/or (ii) to a now or later formed legal entity wholly-owned or majority-owned by the Company.






10.2 Accounting

Upon the dissolution of the Company, an accounting shall be made of the assets and liabilities of the Company and the Capital Account of each Member as of the date of dissolution and of the items of Net Income and Net Loss from the date of the last previous accounting to the date of dissolution. The Liquidating Trustee shall cause Financial Statements presenting such accounting to be prepared and certified.

10.3 Liquidating Trustee.

(a) Upon the dissolution of the Company, the affairs of the Company shall be wound up and terminated and the Members shall continue to share Net Income, Net Loss, Distributable Cash and other items of the Company during the winding-up period in accordance with the provisions of Articles IV and V hereof. The winding-up of the affairs of the Company and the distribution of its assets shall be conducted exclusively by the Liquidating Trustee, who is hereby authorized to do all acts authorized by law for these purposes. The Liquidating Trustee, in carrying out such winding up and distribution, shall have full power and authority to sell, assign, transfer and encumber all or any of the Company assets.

(b) Upon the completion of the winding up of the Company and the distribution of all Company assets, the Company shall terminate and the Liquidating Trustee shall have the authority to execute and record any and all other documents required to effectuate the termination of the Company.

(c) The Liquidating Trustee shall be indemnified and held harmless by the Company from and against any and all claims, liabilities, costs, damages and causes of action of any nature whatsoever arising out of or incidental to the Liquidating Trustee's taking of or failure to take any action authorized under, or within the scope of, this Agreement; provided, however, that the Liquidating Trustee shall not be entitled to indemnification for:

(i) matters entirely unrelated to the Liquidating Trustee's actions under the provisions of this Agreement; or

(ii) fraud, willful misconduct, self-dealing or criminal activity. In the event of the dissolution of the Company for any reason, the assets of the Company shall be liquidated for distribution in the following rank and order:

(x) first, to the payment and discharge of all the debts and liabilities in the order of priority as provided by the Act;

(y) second, to the establishment of any necessary reserves to provide for contingent liabilities, if any; and





(z) third, to the Members in proportion to their Capital Accounts after giving effect to the allocations set forth in Article IV hereof, treating any distribution of property as a sale thereof at fair market value.

10.4 Liquidating Distribution.

Such distributions shall be made on or before a date (the "Final Liquidation Date") no later than the later to occur of (i) the last day of the taxable year of the Company in which the liquidation of the Company occurs and (ii) 90 days after such liquidation. If the Liquidating Trustee, in its discretion, determines that the distributions will not be timely made, it may distribute all of the assets and liabilities of the Company in trust with the Liquidating Trustee, or such other Person as may be selected by the Liquidating Trustee acting as trustee; the purpose of the trust is to allow the Company to comply with the timing requirements under Regulation Section 1.704-1(b). The trustee of said trust shall distribute the former Company assets (however constituted, enhanced or otherwise) as promptly as such trustee deems proper and in the same manner as directed in this Section (without regard to this sentence or the preceding two sentences) and otherwise as required hereunder. The trust shall be terminated as soon as possible after the trust property is distributed to the beneficiaries thereof.

10.5 Distributions in Kind.

Company property distributed in kind shall be transferred and conveyed to the distributees as tenants in common subject to any liabilities attached thereto so as to vest in them undivided interests in the whole of such property in proportion to their respective rights to share in the proceeds of the sale of such property in accordance with this Article.

ARTICLE XI - MISCELLANEOUS

11.1 Appointment of Attorney-in-Fact.

Each of the Members constitutes and appoints the Managing Member as his true and lawful attorney to make, execute, sign, swear to, acknowledge and file in his name, place and stead:

(a) the Articles of Organization; or any amendment(s) thereto;

(b) any other certificate or instrument which may be required to be filed by the Company under the laws of the State of Florida or any other jurisdiction:

(c) any and all amendments or modifications of this Agreement and/or the instruments described in subparagraphs (a) and (b) of this Section 11.1 permitted by this Agreement, including specifically, but without limitation, amendments reflecting the admission of substituted or additional Members pursuant to Article IX (provided that this power shall not entitle the Managing Member to approve of any amendment of this Agreement on behalf of any






Member);

(d) all documents and instruments which may be required to effectuate the dissolution and termination of the Company and cancellation of its Articles of Organization, as may from time to time be amended; and

(e) such other document or documents or instrument or instruments relating to the Company and in keeping with its stated purpose as may be required under the laws of any state or of the United States or of any other jurisdiction.

This power is coupled with an interest, shall survive and not be affected by the subsequent disability, death, dissolution or incapacity of any Member, and shall be irrevocable unless the attorney-in-fact files a petition in bankruptcy or is dissolved, and in any such event, this power with respect to the Managing Member shall be automatically revoked.

11.2 **Amendment**.

This Agreement may be revoked, modified or amended only by the written approval of a Majority in Interest of Members, excluding Defaulted Members; provided, that, subject to Section 9.3 hereof, the Managing Member may amend and supplement this Agreement and Exhibit A to reflect the creation of separate series or classes, changes in Members, Membership Percentages and value of Company assets made in accordance with the provisions of this Agreement, including amendments contemplated by Section 9.3 hereof, without the approval of the Members; and provided further that the approval of a Majority in Interest of the Members, excluding Defaulted Members shall be required to amend this Section 11.2. However, this provision cannot be enacted without the specific notification and agreement of and by ***GDR Privée*** as represented by Charles Grégoire de Rothschild.

11.3 **Further Action**.

Each Member agrees to execute, acknowledge, deliver, file, record and publish such further certificates, amendments to certificates, instruments and documents, and do such other acts and things as may be required by law, or as may be required to carry out the intent and purposes of this Agreement.

11.4 **Notices**.

All notices, demands, consents, approvals, requests, offers or other communications which any of the parties to this Agreement may desire or shall be required to be given hereunder shall be in writing and shall be given (a) by registered or certified mail, return receipt requested, (b) by personal delivery, (c) delivery via nationally recognized overnight delivery service, the cost and expense of such delivery to be borne by the sending party, or (d) by electronic communication (telex or facsimile transmission). All notices shall be addressed to the recipient at the address set forth on Exhibit A hereto unless such address is subsequently changed by such







recipient in accordance with the following procedure. Any Member may designate another address (or change its address) for notices hereunder by delivery of a written notice to the Managing Member in accordance with the provisions of this Section 11.4. Any notice sent in compliance with the above provisions shall be deemed delivered and received, except for electronic communications, on the third business day next succeeding the day on which it was sent, or, if sooner, on the actual date received, and, in the case of electronic communications, only on the date the sending party receives acknowledgment of receipt of such notice.

11.5 **Governing Law; Venue; Jurisdiction; Attorneys' Fees.**

This Agreement is made pursuant to and shall be governed by and construed solely in accordance with the laws of the State of Florida, without regard to its choice of law or conflict of laws principles thereof. Each of the parties hereto expressly submit themselves to and agree that all actions and proceedings arising out of this Agreement shall occur solely in the venue and jurisdiction of the state and federal courts encompassing Broward County, Florida. The prevailing party/parties in any such action or proceeding shall be entitled to recover its/his/her reasonable attorneys' fees and costs from the other party/parties.

11.6 **Headings.**

All articles and section headings or captions contained in this Agreement are inserted only as a matter of convenience and for reference and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

11.7 **Pronouns.**

As used herein, all pronouns shall include the masculine, feminine, neuter, singular and plural thereof wherever the context and facts require such construction.

11.8 **Benefits; Binding Effect.**

The provisions of the Agreement shall be solely for the benefit of the parties hereto and their respective successors and assigns. This Agreement shall be binding upon the parties hereto and their respective executors, administrators, legal representatives, heirs, successors and assigns, and shall inure to the benefit of the parties hereto, and, except as otherwise herein expressly provided, their respective executors, administrators, legal representatives, successors and assigns.

11.9 **No Waiver.**

No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to a party or to the Company shall impair or affect the right of such Member or the Company thereafter to exercise the same. Any extension of time or other indulgences granted to a Member hereunder shall not otherwise alter or affect any power, remedy or right of any other Member or of the Company or of the obligations of the Member to whom such






extension or indulgence is granted.

11.10 **Severability.**

If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to such Person or circumstances, other than as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and shall be enforced to the fullest extent permitted by law.

11.11 **Entire Agreement.**

This Agreement, and the schedules and exhibits hereto, [**together with the CNC Agreement**] contain the entire understanding and agreement of the parties hereto relating to the subject matter hereof and all prior agreements relative hereto which are not contained herein. This Agreement may not be amended or modified in any manner, except by a written instrument executed by all of the parties hereto.

11.12 **Counterparts; Telecopier.**

This Agreement may be executed in one or more counterparts and via telecopier, each of which shall be deemed an original, and all of which, when taken together, shall be deemed one agreement.

11.13 **Third Party Beneficiaries.**

The provisions of this Agreement shall be solely for the benefit of the parties hereto and their respective successors and assigns.

11.14 **Rule of Construction that Ambiguities are to be Construed Against the Drafter not Applicable**

The parties to this Agreement acknowledge that they have carefully read and reviewed this Agreement with their respective counsel, and therefore, agree that the rule of construction that ambiguities shall be construed against the drafter of the document shall not be applicable.

IN WITNESS WHEREOF, each of the parties hereto have caused this Agreement to be duly executed as of the date set forth next to their respective signatures on Exhibit A.

Conundrum Capital LLC

By:____________________________
Jordan Serlin, Managing Member





By: ______________________________

*GDR Privée* as represented by Charles Grégoire de Rothschild, Member

EXHIBIT A TO LIMITED LIABILITY COMPANY OPERATING AGREEMENT OF CONUNDRUM CAPITAL LLC

| NAME AND ADDRESS OF MEMBER | INITIAL CAPITAL CONTRIBUTION | NUMBER OF UNITS OWNED | MEMBERSHIP PERCENTAGE | DATE/SIGNATURE |
|---|---|---|---|---|
| Jordan Serlin<br>17076-5 Boca Club Blvd<br>Boca Raton, Florida 33487 | $350,000.00 | 2 | 66.67% | 6/23/10 |
| *GDR Privée*<br>As represented by:<br>Charles Grégoire de Rothschild<br>Chairman<br>16 West 45th Street, 2nd Floor<br>New York, NY 10036 | $0.00 | 1 | 33.33% | 6/23/10 |

By signing above, all members understand that member distributions will be comprised of net income only, to be distributed monthly in accordance with each member's percentage listed above.

WELMY A. VALERIO
Notary Public - State of New York
NO. 01VA6162918
Qualified in Bronx County
My Commission Expires 03/19/20[illegible]

**All members of Conundrum Capital LLC have agreed that the membership percentage of* ***GDR Privée*** *shall and always will remain at 33.33%, irrespective if new Members join the LLC, or if new Membership Units are issued by the LLC. In such an event,* ***GDR Privée*** *will automatically be issued Units so that a 33.33% ownership stake can be maintained.*





# EXHIBIT C

AMENDMENT

TO

Limited Liability Operating Agreement

Of

Conundrum Capital LLC

September 21, 2010

Be it resolved that ***GDR Privée*** as represented by Charles Grégoire de Rothschild, will now be a 49% ownership Member of Conundrum Capital LLC.

Be it resolved that Jordan D. Serlin, will now be a 51% ownership Member of Conundrum Capital LLC, and will remain as Managing Member as defined in the Conundrum Capital LLC Operating Agreement as executed on June 10th, 2010.

Be it resolved that ***GDR Privée*** and Jordan D. Serlin will now share profits equally 50 % ***GDR Privée*** and 50% Jordan D. Serlin.

Be it resolved that any major, extraordinary or unusual decision must be approved in writing by both parties.

Be it resolved that the only two named Members (Partners) in Conundrum Capital LLC are and will be ***GDR Privée*** and Jordan D. Serlin, and that no additional Members (Partners) will be included in or be a part of Conundrum Capital LLC as a Member (Partner) without the written consent of both ***GDR Privée*** and Jordan D. Serlin.

All other terms and conditions of the June 10th, 2010 operating agreement remain in full force and effect.

Agreed to on this date, September 21, 2010:

Conundrum Capital LLC

By:____________________________
Jordan Serlin, Managing Member

By:____________________________
***GDR Privée*** as represented by Charles Grégoire de Rothschild, Member

PLAINTIFF'S EXHIBIT

C

# EXHIBIT D

AMENDMENT

TO

Limited Liability Operating Agreement

Of

Conundrum Capital LLC

March 29, 2011

Be it resolved that ***GDR Privée*** as represented by Charles Grégoire de Rothschild, Member of Conundrum Capital LLC and Jordan D. Serlin, Managing Member of Conundrum Capital LLC agree to the following Amendment to the June 10th, 2010 Operating Agreement:

1.) Expenses: The Managing Member agrees that all Members of the company must be informed, in writing, in advance, of any non-standard expenses which may be incurred by the company in excess of $1,000.00 over the next three months from the date of this amendment. At that time, the Members will discuss if this threshold should be maintained, be raised, or removed. During this three month period, or until this policy is modified by the Members, the Managing Member will need to inform all Members as to why the expense is needed, how said expense may affect any current or future Member distributions, and at what date such an expense would need to be incurred. The Managing Member will be disallowed from incurring any such expense as indicated, until such time as each Member has been notified, in writing, and has responded to the Managing Member with their understanding that such an expense is justified. If a disagreement occurs over the question if an appropriately notified expense should occur, all Members agree to convene and discuss the needs and merits of said expense item, prior to any expense of this nature being incurred. With the understanding that such an extraordinary expense item may be extremely time-sensitive for the smooth and continuing operations of the Company, all Members agree that such notifications, responses, meetings, and final decisions will occur prior to the date such an expense would need to be incurred.

All other terms and conditions of the June 10th, 2010 operating agreement remain in full force and effect, as well as any other Amendments which have been executed by all Members.

Agreed to on this date, March 29, 2011:

Conundrum Capital LLC

By: ____________________
Jordan Serlin, Managing Member

PLAINTIFF'S EXHIBIT

D

By:________________________________

***GDR Privée*** as represented by Charles Grégoire de Rothschild, Member

# EXHIBIT E

# New York City Police Department
## Omniform System - Complaints

| Report Cmd: 014 | Jurisdiction: N.Y. POLICE DEPT | Record Status: Final, No Arrests | Complaint #: 2012-014-02144 |
|---|---|---|---|

**Occurrence Location:** INSIDE OF 16 WEST 45 STREET
Name Of Premise: GDR PRIVEE INC
Premises Type: COMMERCIAL BUILDING
Location Within Premise: MANAGEMENT OFFICES/O.
Visible By Patrol?: NO

Precinct: 014
Sector: E
Beat: 9
Post: 47

**Occurrence From:** 2011-08-09 02:33 TUESDAY
Occurrence thru: 2012-02-24 00:30
Reported: 2012-02-24 17:00
Complaint Received: PHONE

Aided #
Accident #
O.C.C.B. #

**Classification:** AGG HARASSMENT
Attempted/Completed: COMPLETED
Most Serious Offense is: MISDEMEANOR
PD Code: 639 AGGRAVATED HARASSMENT 2
PL Section: 24030
Keycode: 361 OFF. AGNST PUB ORD SENSBLTY &

**Case Status:** OPEN
Unit Referred To: P.D.U.
Clearance Code:
Log/Case #: 0
File #:
Prints Requested? NO

| Is This Related To Stop And Frisk Report | SQF Number: | Was The Victim's Personal Information Taken Or Possessed? | Was The Victim's Personal Information Used To Commit A Crime? |
|---|---|---|---|
| NO | 0000-000-00000 | NO | NO |

| Gang Related? | OCCB FOD Log #: | Name Of Gang: | Child Abuse Suspected? |
|---|---|---|---|
| NO | | | NO |

| DIR Required? | Child In Common? | Intimate Relationship? |
|---|---|---|
| NO | NO | NO |

| If Burglary: | Alarm: | If Arson: | Taxi Robbery: |
|---|---|---|---|
| Forced Entry? | Bypassed? | Structure: | Partition Present: |
| Structure: | Comp Responded?: | Occupied?: | Amber Stress Light Activated: |
| Entry Method: | Company Name/Phone: | Damage by: | Method of Conveyance: |
| Entry Location: | Crime Prevention Survey Requested?: | | Location of Pickup: |
| | Complainant/Reporter Present?: | | |

| Supervisor On Scene - Rank / Name / Command : | Canvas Conducted: | Translator(If used): |
|---|---|---|
| | NO | |

NARRATIVE:
@ TPO CV STATES THAT HE RECIEVED SEVERAL EMAIL MESSAGES FROM SUSPECT STATING "I'LL TAKE AWAY FROM YOU IN BLOOD." CV IS IN FEAR FOR HIS SAFETY.

No NYC TRANSIT Data for Complaint # 2012-014-02144

| Total Victims: | Total Witnesses: | Total Reporters: | Total Wanted: |
|---|---|---|---|
| 1 | 0 | 1 | 1 |

| *VICTIM: # 1 of 1* | Name: SERLIN,JORDAN | Complaint#: 2012-014-02144 |
|---|---|---|

Nick/AKA/Maiden:
UMOS: NO
Sex/Type: MALE
Race: WHITE
Age: 40
Date Of Birth: [redacted]
Disabled? NO
Is this person not Proficient in English?: NO
If Yes, Indicate Language:
N.Y.C.H.A Resident? NO
Is Victim fearful for their safety / life?
Escalating violence / abuse by suspect?
Were prior DIR's prepared for C/V?

Gang/Crew Affiliation: NO
Name:
Identifiers:

Will View Photo: YES
Will Prosecute: YES
Notified Of Crime Victim Comp. Law: NO

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM |
|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | | | | |
| HOME-TEMPORARY | [redacted] | MANHATTAN | NEW YORK | [redacted] | |

Phone #: HOME-[redacted]-848-5623 BUSINESS-[redacted]

| Action against Victim: | Actions Of Victim Prior To Incident: UNK |
|---|---|
| Victim Of Similar Incident: NO | If Yes, When And Where |

| *REPORTER: # 1 of 1* | Name: SERLIN,JORDAN | Complaint #: 2012-014-02144 |
|---|---|---|

Nick/AKA/Maiden:

Gang/Crew Affiliation: NO

PLAINTIFF'S EXHIBIT
E

Sex/Type: MALE
Race: WHITE
Age: 040
Date Of Birth: [redacted]
Is this person not Proficient In English?: NO
If Yes, Indicate Language:

Name:
Identifiers:

Relationship To Victim:

| Location | Address | City | State/Country | Zip | Apt/Room |
|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | | | | |
| HOME-TEMPORARY | [redacted] | MANHATTAN | NEW YORK | | |

Phone #: HOME: [redacted] BUSINESS: [redacted]

| WANTED: # 1 of 1 | Name: GREGOIRE DE ROTHCHILD, CHARLES | Complaint#: 2012-014-02144 |
|---|---|---|

Nick/AKA/Maiden:
Sex: MALE
Race: WHITE
Age: 68
Date Of Birth: [redacted]
U.S. Citizen:
Place Of Birth:
Is this person not Proficient In English?: NO
If Yes, Indicate Language:
Accent: NO

Height: 5FT09IN
Weight: 150
Eye Color:
Hair Color: BLACK
Hair Length: SHORT
Hair Style: UNKNOWN
Skin Tone: UNKN
Complexion: UNKNOWN
S.S. #: 0

Order Of Protection: NO
Issuing Court:
Docket #:
Expiration Date:
Order of Protection Violated?
Does Suspect abuse Drugs / Alcohol?
Suspect threatened /attempted suicide?
Is the suspect Parole / Probation?
Relation to Victim: FRIEND/ACQUAINTANCE
Living together: NO
Can be Identified: YES

Gang/Crew Affiliation:
Name:
Identifiers:

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM | HOW LONG? | RES. PCT |
|---|---|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | | | | | | |

Phone #: HOME [redacted] CELL: [redacted]

N.Y.C.H.A. Resident: N.Y.C. Housing Employee: On Duty:
Development: N.Y.C. Transit Employee:

Physical Force: THREATENED

Weapons:

Gun:
Weapon Used/Possessed: NONE
Non-Firearm Weapon:
Other Weapon Description:

Make:
Caliber:
Color:
Type:
Other/Gun Specify:
Discharged: NO

Recovered:
Serial Number Defaced:
Serial Number:

Used Transit System:
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poses:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | E MAILS |
| CLOTHING | HEADGEAR -UNK -UNKNOWN COLOR |
| CLOTHING | FOOTWEAR -UNK -UNKNOWN COLOR |
| CLOTHING | OUTERWEAR -UNK -UNKNOWN COLOR |
| CLOTHING | ACCESSORIES -UNK -UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

No IMEI Data for Complaint # 2012-014-02144

| Name | Tax #: | Command: | Rep.Agency: |
|---|---|---|---|
| Reporting/Investigating M.O.S. Name: DT3 TEJERA JUAN | [redacted] | MDA MTS | NYPD |
| Supervisor Approving Name: LCD WEST JAMES | [redacted] | MDA MTS | NYPD |
| Complaint Report Entered By: PAA KELLUM | [redacted] | M PCT 5 | NYPD |
| Signoff Supervisor Name: SGT FREER | [redacted] | M PCT 5 | NYPD |

[redacted] 2012

| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - INTERVIEW | | | | Crime/Condition OFF. AGNST PUB ORD SENSBLTY & | Command 014-MIDTOWN PRECINCT SOUTH<br>Date of This Report 03/10/2012 |
|---|---|---|---|---|---|
| Date of UF61 02/24/2012 | Date Case Assigned 02/24/2012 | Complaint No. 2012-014-02144 | Case No. 2012 - 647 | Unit Reporting SQUAD | Follow-Up No. 1 |

| Complainant's Name SERLIN, JORDAN | Address [redacted] | | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name | | | | |
| Sex MALE | Race WHITE | Date of Birth [redacted] | Age 40 | |
| Home Telephone [redacted] | Business Telephone [redacted] | Cell Phone [redacted] | Beeper # 999-999-9999 | E-Mail Address JORDAN@SERLIN.ORG |

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | | Intersection of and | | | Premise Type |

Topic/Subject:
(INTERVIEW) INTERVIEW OF MR. JORDAN SERLIN

Summary of Investigation:

1. On February 24, 2012, at approximately 1700 hours I did Interview Mr. Jordan Serlin over the phone in regards to this Aggravated Harassment.

2. Mr. Serlin states that while on business in New York, he stayed at a Hotel Edison located at 228 West 47 Street New York, NY. Mr. Serlin states that as he was checking his computer he received several email allegedly from his business partner Mr. Charles Gregoire De Rothchild. Mr. Serlin states that Mr. Gregoire De Rothchild did state in an email, "You wil I held responsible personally for all the consequences according the laws, including penalties according tax code. I will take everything from you. You pay with your blood". Mr. Serlin states that he is in fear of his safety.

3. Case Status: ACTIVE.

| Reporting Officer: | Rank DT3 | Name JUAN TEJERA | | Tax Reg. No. [redacted] | Command 241-MTS DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 03/10/2012 | Date of Next Review | Name PHILLIP PANZARELLA | Supv. Tax No. [redacted] |

Place Of Birth:
Is this person not Proficient In English?: NO
If Yes, Indicate Language:
Accent: NO

Skin Tone: UNKN
Complexion: UNKNOWN
S.S. #: 0

Does Suspect abuse Drugs / Alcohol?
Suspect threatened /attempted suicide?
Is the suspect Parole / Probation?
Relation to Victim: FRIENDS/ACQUAINTANCE
Living together: NO
Can be Identified: YES

Gang/Crew Affiliation:
Name:
Identifiers:

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM | HOW LONG? | RES. PCT |
|---|---|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | [redacted] | | | | | |

Phone #: HOME: [redacted]

N.Y.C.H.A. Resident: N.Y.C. Housing Employee: On Duty:
Development: N.Y.C. Transit Employee:

Physical Force: THREATENED

Weapons:

Gun:
Weapon Used/Possessed: NONE
Non-Firearm Weapon:
Other Weapon Description:
Make:
Caliber:
Color:
Type:
Other/Gun Specify:
Discharged: NO
Recovered:
Serial Number Defaced:
Serial Number:

Used Transit System:
Station Entered:
Time Entered:
Metro Card Type:
Metro Card Used/Poss:
Card #:

| CRIME DATA | DETAILS |
|---|---|
| MODUS OPERANDI | UNKNOWN |
| ACTIONS TOWARD VICTIM | E MAILS |
| CLOTHING | HEADGEAR -UNK -UNKNOWN COLOR |
| CLOTHING | FOOTWEAR -UNK -UNKNOWN COLOR |
| CLOTHING | OUTERWEAR -UNK -UNKNOWN COLOR |
| CLOTHING | ACCESSORIES -UNK -UNKNOWN COLOR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | -UNKNOWN |
| BODY MARKS | -UNKNOWN |
| IMPERSONATION | UNKNOWN |

No IMEI Data for Complaint # 2012-014-02144

| | Tax #: | Command: | Rep.Agency: |
|---|---|---|---|
| Reporting/Investigating M.O.S. Name: DT3 TEJERA JUAN | [redacted] | MDA MTS | NYPD |
| Supervisor Approving Name: LCD WEST JAMES | [redacted] | MDA MTS | NYPD |
| Complaint Report Entered By: PAA KELLUM | [redacted] | M PCT 3 | NYPD |
| Signoff Supervisor Name: SGT FREER | [redacted] | M PCT 3 | NYPD |

END OF COMPLAINT REPORT
# 2012-014-02144

| | | | | |
|---|---|---|---|---|
| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - EAS ENTITY SEARCH REQUEST | | | Crime/Condition<br>OFF. AGNST PUB ORD SENSBLTY & | Command<br>014-MIDTOWN PRECINCT SOUTH<br>Date of This Report<br>02/25/2012 |
| Date of UF61<br>02/24/2012 | Date Case Assigned<br>02/24/2012 | Complaint No.<br>2012-014-02144 | Case No.<br>2012 - 647 | Unit Reporting<br>SQUAD | Follow-Up No.<br>2 |

| Topic/Subject | Activity Date | Activity Time |
|---|---|---|
| (EAS ENTITY SEARCH REQUEST) VICTIMOLOGY | 02/25/2012 | 08:15 |

**EAS Search**

| Last Name | First Name | DOB | SSN | NYSID | Building | Address | City |
|---|---|---|---|---|---|---|---|
| SERLIN | JORDAN | [redacted] | | | 17076-5 | [redacted] | [redacted] |

| Phone 1 | Phone 2 | Phone 3 | Phone 4 |
|---|---|---|---|
| [redacted] | [redacted] | | [redacted] |

| Credit Card 1 | Credit Card 2 | Credit Card 3 | Credit Card 4 |
|---|---|---|---|
| | | | |

| Driving License | Passport | License Plate |
|---|---|---|
| | | |

**Details**

Summary of Investigation:
1. On February 25, 2012, at approximately 0015 hours I did request an EAS entity search in regards to this victimology.

2. Case Status: ACTIVE.

| | | | | | |
|---|---|---|---|---|---|
| Reporting Officer: | Rank<br>DT3 | Name<br>JUAN TEJERA | | Tax Reg. No.<br>[redacted] | Command<br>241-MTS DET SQUAD |
| Reviewing Supervisor: | Manner of Closing<br>- | Date Reviewed<br>03/01/2012 | Date of Next Review | Name<br>PHILLIP PANZARELLA | Supv. Tax No.<br>[redacted] |

[redacted]

| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - EAS ENTITY SEARCH RESULT | | | | Crime/Condition OFF. AGNST PUB ORD SENSBLTY & | Command 014-MIDTOWN PRECINCT SOUTH Date of This Report 02/25/2012 |
|---|---|---|---|---|---|
| Date of UF61 02/24/2012 | Date Case Assigned 02/24/2012 | Complaint No. 2012-014-02144 | Case No. 2012 - 647 | Unit Reporting SQUAD | Follow-Up No. 3 |

| Topic/Subject | Activity Date | Activity Time |
|---|---|---|
| (EAS ENTITY SEARCH RESULT) VICTIMOLOGY | 02/25/2012 | 08:15 |

EAS Search

| Last Name | First Name | DOB | SSN | NYSID | Building | Address | City |
|---|---|---|---|---|---|---|---|
| SERLIN | JORDAN | | | | 17076-5 | | |

| Phone 1 | Phone 2 | Phone 3 | Phone 4 |
|---|---|---|---|
| | | | 561-84816622 |
| Credit Card 1 | Credit Card 2 | Credit Card 3 | Credit Card 4 |
| Driving License | Passport | License Plate | |

EAS Search Result
No matching record(s) were found for given criteria.

Details
Summary of Investigation:
1. On , at approximately

| Reporting Officer: | Rank DT3 | Name JUAN TEJERA | | Tax Reg. No. | Command 241-MTS DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 03/01/2012 | Date of Next Review | Name PHILLIP PANZARELLA | Tax No. |

| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - GENERAL INVESTIGATION | | | | Crime/Condition OFF. AGNST PUB ORD SENSBLTY & | Command 014-MIDTOWN PRECINCT SOUTH Date of This Report 05/02/2012 |
|---|---|---|---|---|---|
| Date of UF61 02/24/2012 | Date Case Assigned 02/24/2012 | Complaint No. 2012-014-02144 | Case No. 2012 - 647 | Unit Reporting SQUAD | Follow-Up No. 4 |

| Complainant's Name SERLIN, JORDAN | | Address [redacted] | | Apt No. |
|---|---|---|---|---|
| Nickname/Alias/Middle Name NONE | | | | |
| Sex MALE | Race WHITE | Date of Birth 10/21/1971 | Age 40 | |
| Home Telephone [redacted] | Business Telephone [redacted] | Cell Phone [redacted] | Beeper # [redacted] | E-Mail Address JORDA[redacted] |

| Activity Address Location OFFICE | | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|---|
| Cross Street | | | Intersection of and | | | Premise Type |

**Topic/Subject:**
COMPUTER CRIMES

**Summary of Investigation:**
1. On May 2, 2012, at approximately 1110 hours I did speak to Detective Carlo of Computer Crimes in regards to this aggravated harassment. I did request a subpoena for Mr. Charles Gregoire De Rothchild email messages. The subpoena is to determine if in fact Mr. Rothchild sent Mr. Jordan Serlin any messages and to prove that Mr. Rothchild is also in fact the owner of email gdr@gdrprivee.com.

2. Case Status: ACTIVE.

| Reporting Officer: | Rank DT3 | Name JUAN TEJERA | | Tax Reg. No. [redacted] | Command 241-MTS DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing - | Date Reviewed 05/02/2012 | Date of Next Review | Name JOSEPH LATTUGA | Supv. Tax No. [redacted] |

| COMPLAINT - FOLLOW UP INFORMATIONAL REPORT - CLOSING | | | | Crime/Condition OFF. AGNST PUB ORD SENSBLTY & | Command 014-MIDTOWN PRECINCT SOUTH Date of This Report 05/02/2012 |
|---|---|---|---|---|---|
| Date of UF61 02/24/2012 | Date Case Assigned 02/24/2012 | Complaint No. 2012-014-02144 | Case No. 2012 - 647 | Unit Reporting SQUAD | Follow-Up No. 6 |

| Complainant's Name SERLIN, JORDAN | Address | | Apt No. |
|---|---|---|---|
| Nickname/Alias/Middle Name NONE | | | |
| Sex MALE | Race WHITE | Date of Birth | Age 40 |
| Home Telephone | Business Telephone | Cell Phone | Beeper # 999-999-9999 | E-Mail Address |

| Activity Address Location OFFICE | Street | City | State | Zip | Apt # |
|---|---|---|---|---|---|
| Cross Street | Intersection of and | | | | Premise Type |

**Topic/Subject:**
(CLOSING) CASE CLOSED

**Summary of Investigation:**

1. On May 2, 2012, at approximately 1115 hour I recommend this Aggravated harassment be marked closed at this time.

2. I did submit a subpoena with Detective Carlo of computer crimes to determine if Mr. Charles Gregoire De Rothchild sent any threatening messages to Mr. Jordan Serlin. I also requested to determine the owner of email gdr@gdrprivee.com.

3. I recommend this incident be marked closed as pending financial records requested.

4. Case Status: CLOSED.

| Reporting Officer: | Rank DT3 | Name JUAN TEJERA | | Tax Reg. No. | Command 241-MTS DET SQUAD |
|---|---|---|---|---|---|
| Reviewing Supervisor: | Manner of Closing C-11 - | Date Reviewed 05/02/2012 | Date of Next Review | Name JOSEPH LATTUC | Supv. Tax No. |

# New York City Police Department
## Omniform System - Complaints

Report Cmd: 014 | Jurisdiction: N.Y. POLICE DEPT | Record Status: Final, No Arrests | Complaint #: 2012-014-02144

Occurrence Location: INSIDE OF 16 WEST 45 STREET
Name Of Premise: GDR PRIVEE INC
Premises Type: COMMERCIAL BUILDING
Location Within Premise: MANAGEMENT OFFICES/O.
Visible By Patrol?: NO

Precinct: 014
Sector: E
Beat: 9
Post: 47

Occurrence From: 2011-08-09 02:33 TUESDAY
Occurrence thru: 2012-02-24 00:30
Reported: 2012-02-24 17:00
Complaint Received: PHONE

Aided #
Accident #
O.C.C.B. #

Classification: AGG HARASSMENT
Attempted/Completed: COMPLETED
Most Serious Offense is: MISDEMEANOR
PD Code: 639 AGGRAVATED HARASSMENT 2
PL Section: 24030
Keycode: 361 OFF. AGNST PUB ORD SENSBLTY &

Case Status: OPEN
Unit Referred To: P.D.U.
Clearance Code:
Log/Case #: 0
File #:
Prints Requested? NO

| | |
|---|---|
| Is This Related To Stop And Frisk Report: NO | SQF Number: 0000-000-00000 |
| Was The Victim's Personal Information Taken Or Possessed? NO | Was The Victim's Personal Information Used To Commit A Crime? NO |
| Gang Related? NO | OCCB FOD Log #: |
| Name Of Gang: | Child Abuse Suspected? NO |
| DIR Required? NO | Child In Common? NO |
| Intimate Relationship? NO | |

**If Burglary:** Forced Entry? Structure: Entry Method: Entry Location:

**Alarm:** Bypassed? Comp Responded?: Company Name/Phone: Crime Prevention Survey Requested?: Complaint/Reporter Present?:

**If Arson:** Structure: Occupied?: Damage by:

**Taxi Robbery:** Partition Present: Amber Stress Light Activated: Method of Conveyance: Location of Pickup:

Supervisor On Scene - Rank / Name / Command: | Canvas Conducted: NO | Translator(if used):

NARRATIVE:
@ TPO CV STATES THAT HE RECIEVED SEVERAL EMAIL MESSAGES FROM SUSPECT STATING "I'LL TAKE AWAY FROM YOU IN BLOOD." CV IS IN FEAR FOR HIS SAFETY.

No NYC TRANSIT Data for Complaint # 2012-014-02144

| Total Victims: | Total Witnesses: | Total Reporters: | Total Wanted: |
|---|---|---|---|
| 1 | 0 | 1 | 1 |

*VICTIM: # 1 of 1* | Name: SERLIN,JORDAN | Complaint#: 2012-014-02144

Nick/AKA/Maiden:
UMOS: NO
Sex/Type: MALE
Race: WHITE
Age: 40
Date Of Birth: [redacted]
Disabled?
Is this person not Proficient in English?: NO
If Yes, indicate Language:
N.Y.C.H.A Resident? NO
Is Victim fearful for their safety / life?
Escalating violence / abuse by suspect?
Were prior DIR's prepared for C/V?

Gang/Crew Affiliation: NO
Name:
Identifiers:

Will View Photo: YES
Will Prosecute: YES
Notified Of Crime Victim Comp. Law: NO

| LOCATION | ADDRESS | CITY | STATE/COUNTRY | ZIP | APT/ROOM |
|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | BOCARATON | FLORIDA | | |
| HOME-TEMPORARY | [redacted] | MANHATTAN | NEW YORK | | |

Phone #: HOME: [redacted]

Action against Victim: | Actions Of Victim Prior To Incident: UNK

Victim Of Similar Incident: NO | If Yes, When And Where

*REPORTER: # 1 of 1* | Name: SERLIN,JORDAN | Complaint #: 2012-014-02144

Nick/AKA/Maiden:
Sex/Type: MALE
Race: WHITE
Age: 040
Date Of Birth: [redacted]
Is this person not Proficient in English? [redacted]
If Yes, indicate Language:

Gang/Crew Affiliation: NO
Name:
Identifiers:

Relationship To Victim:

| Location | Address | City | State/Country | Zip | Apt/Room |
|---|---|---|---|---|---|
| HOME-PERMANENT | [redacted] | BOCARATON | FLORIDA | | |
| HOME-TEMPORARY | [redacted] | MANHATTAN | NEW YORK | | |

Phone #: HOME [redacted]3-8622 BUSINESS: [redacted]

*WANTED: # 1 of 1* | Name: GREGOIRE DE ROTHCHILD, CHARLES | Complaint#: 2012-014-02144

Nick/AKA/Maiden:
Sex: MALE
Race: WHITE
Age: 68
Date Of Birth: 02/12/1944
U.S. Citizen:

Height: 5FT09IN
Weight: 150
Eye Color:
Hair Color: BLACK
Hair Length: SHORT
Hair Style: UNKNOWN

Order Of Protection: NO
Issuing Court:
Docket #:
Expiration Date:
Order of Protection Violated?

# EXHIBIT F

Oct 07 14 05:29p p.3

# ARTICLES OF DISSOLUTION

Pursuant to section 608.445, Florida Statutes, this Florida limited liability company submits the following Articles of Dissolution:

FIRST: The name of the limited liability company as currently filed with the Florida Department of State: CONUNDRUM CAPITAL, LLC

SECOND: The document number of the limited liability company: L10000040211

THIRD: The file date of the articles of organization: April 14, 2010

FOURTH: The date the dissolution was approved: February 29, 2012

FIFTH: A description of occurance that resulted in the limited liability company's dissolution pursuant to section 608.441, Florida Statutes:

IN ACCORDANCE WITH ARTICLES, MAJORITY VOTE OF MEMBERS APPROVED DISSOLUTION, FOR ASSIGNMENT TO RECEIVER.

SIXTH: Adequate provision has been made for the debts, obligations and liabilities pursuant to s. 608.4421.

SEVENTH: All remaining property and assets have been distributed among its members in accordance with their respective rights and interests.

EIGHTH: Adequate provision has been made for satisfaction of any judgment, order or decree which may be entered against it in any pending suit.

I/we submit this document and affirm that the facts stated herein are true. I/we am/are aware that any false information submitted in a document to the Department of State constitutes a third degree felony as provided for in section 817.155, Florida Statutes.

Signature: JORDAN D. SERLIN

Electronic Signature of Member having the same percentage of membership interest necessary to approve the dissolution




Received Time Oct. 7. 2014 5:27PM No. 3475

Begin forwarded message:

**From:** "Jordan Serlin" <js@fordallen.com>
**Date:** November 12, 2013 at 5:59:36 PM EST
**To:** "David Fritz" <dfritz@boyarskifritz.com>
**Subject: RE: Conversation**

Hi David, I have answered some of your questions in-line below.

---

**From:** David Fritz [mailto:dfritz@boyarskifritz.com]
**Sent:** Tuesday, November 12, 2013 4:20 PM
**To:** Jordan Serlin
**Subject:** Re: Conversation

Hi Jordan – sorry that I didn't get back to you sooner.

I have had conversations with several trustees of the asbestos trusts that we discussed. Below is a collection of the various information requests that came back to me from those individuals:

Eagle International LLC

1. Who are the members of Eagle International LLC? Please include short bios and cap table.
I am the primary member of Eagle International LLC with 90%. The Secondary Member is Integrity Dominion Funds.



2. Who are the traders (other than members of Eagle International LLC)? Please provide detail on how are they compensated as well as short bios. All trading team members share a percentage of profits generated by our company.

3. Which broker-dealers does Eagle International LLC utilize? Are the accounts insured up to a specified amount (through an affiliation such as SIPC)? We primarily utilize FQ Securities. As an investment account, the SPIC type insurance varies from broker to broker. In the case of FQ Securities, the trust accounts are held at WestPac in Australia and are subject to their insurance regulations. Many of our clients have their own broker already and we are simply provided MT4 access to trade.

4. What bank does Eagle International LLC use? If there are multiple banks, please identify them. Are all of those banks FDIC insured? As Eagle never accepts client funds directly, and does not serve to transit any client capital, we do not identify the banks we utilize for operational purposes, as there never is any interaction with the client-side of our business.

5. As the accounts are managed accounts, are the monies transferred to Eagle International LLC and then placed into a sub-account in the name of the trust? No, the client funds are transmitted directly to the clearing firm (Broker) who sets up the accounts in the name of the trust. The trust is the client and has complete control of the account. Eagle is only provided trading access via LPOA.

6. What is the total amount of monies managed by Eagle International LLC? Of that total amount, how much of those monies are from members' own accounts?

7. Please provide the name and contact info of Eagle International LLC's accounting firm. We are not an audited firm.

8. Please provide the name and contact info of Eagle International LLC's law firm that is uses for securities compliance issues (and if Eagle International LLC uses another law firm for day-to-day matters, the name and contact info of that law firm). As a managed account trading firm, which does not directly accept client capital, we do not utilize a law firm for these types of issues. We are simply a hired trader.

9. Please forward Eagle International LLC's client agreement for review.

10. Please forward Eagle International LLC's latest financial statements. Are they audited? Please also provide the latest monthly performance report (through October, 2013). Please indicate if the performance report is net of compensation to Eagle International LLC.

11. How many employees does Eagle International LLC have? Please provide an org chart.

12. Each trust has rules governing the amount of monies under management. I understand that since the accounts are managed accounts, there is less importance given to this issue (since the monies, as I understand, are in the client's account and access; unlike a hedge fund or private equity fund where it's not easy for a client to pull their monies out of a fund). Although managed accounts, I have been asked by several trustees to be provided with a monthly report, over the last 3 years, of the total amount that Eagle International LLC has under management.

13. How are fees paid to Eagle International LLC? Are they taking directly from the account? This depends on the agreement reached. Normally, when a high-water-mark is achieved, the performance fee to Eagle International is deducted as a percentage of the profit for that month, and the clearing firm (broker) sends it to Eagle as fees earned.

<u>Non-Trust</u>:

I may have off-shore clients that I can introduce to Eagle International LLC. Does Eagle International LLC accept off-shore clients? Most of our clients are off-shore clients. We currently do not trade or transit any funds through the United States.

I may have some questions for you on the pub co (I may have interest there as well). If you could get me answers by Thursday afternoon, it would be great – I'm seeing several of the trustees early Friday. Sorry that I have so many questions for you but these are sophisticated guys who have a lot of monies to manage!
Let me know if you have any questions – thanks, David

- -
David P. Fritz
Boyarski Fritz LLP
Attorneys-At-Law
1330 Avenue of the Americas, Suite 1800
New York, New York 10019

212-920-4925 x102 Phone
917-930-0100 Cell

On Fri, Oct 11, 2013 at 8:52 AM, Jordan Serlin <js@fordallen.com> wrote:
Good morning David,

Any feedback? Thanks and hope all is well.

------------------------------
Sent from my iPhone and the friendly ghost of Steve Jobs

Jordan Serlin
+1-561-843-6622

On Oct 9, 2013, at 8:35 AM, "David Fritz" <dfritz@boyarskifritz.com> wrote:

> I think so - I have a client emergency that started yesterday that should be fixed today - once I'm done with that issue, I'm going to review and call you - send me info on that as well - thanks, David
>
> David Fritz
> Boyarski Fritz LLP
> Attorneys-At-Law
> 1330 Avenue of the Americas Suite 1800
> New York, New York 10019
> 212-920-4925 x102 office
> 917-930-0100 cell
>
> Sent from my iPhone
>
> On Oct 9, 2013, at 8:24 AM, "Jordan Serlin" <js@fordallen.com> wrote:
>
> > David,

# EXHIBIT H




## MANAGED ACCOUNT INVESTMENT PROGRAM – LOW YIELD

| | | | |
|---|---|---|---|
| Trading Advisor: | Conundrum Capital LLC | Trading Location: | Global Currency Markets |
| Program Name: | Discretionary Capital Preservation | Trading Inception: | January, 2010 |
| Portfolio Manager(s): | Jordan Serlin / Peter Losonszky | Investment Strategy: | CTA / CPO |
| Primary Trade Location (s): | Orlando, New York, London, San Francisco Zurich, Panama, Frankfurt | Manager Trading Style: | Customized Discretionary |
| Website: | www.conundrum-capital.com | | |
| Marketing Contact: | info@conundrum-capital.com +1-561-998-2872 | Reporting Date: | November, 2011 |
| | | Current Availability: | Accepting new clients |

## TRADING STRATEGY DESCRIPTION

Conundrum Capital is a systematic trading strategy which melds our proprietary internal signaling software (algorithms) with our live human-based trading team. Our focus is only in live currency trading (FX), with no derivative elements. All managed accounts are held on an individual basis, in the name of the client or entity. There is no co-mingling of client funds or accounts. Our program consists of multiple elements designed to limit client risk levels, while achieving consistent, robust, and stable investment returns. We normally focus on primary G-20 currency pairs, with an average holding period range from a few hours to four days. Our program itself consists of five co-operative yet independent strategies: a short-term / long-term volatility strategy, a short-term / mid-term following strategy, a short-term counter-trend VIX strategy, a risk analysis and capture strategy, and a trading-pair correlation strategy. These five strategies operate in parallel, providing indicated signals on trades, indicated signals on one or more trade series options, and overall trade optimizations for our live trading staff. All trades are hand-entered with a pre-determined target price, and are protected by a client-defined stop loss.

## AVERAGE PERFORMANCE – LOW YIELD PROGRAM

**Discretionary Capital Preservation Trading (Signaled with Account Manager)**

| | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2011 | 6.85% | 5.22% | 5.54% | 4.35% | 5.60% | 1.9% | 4.16% | 0.056% | 8.32% | 3.12% | 2.65% | | |
| 2010 | 5.82% | 2.83% | 7.16% | 4.23% | 4.75% | 9.25% | 7.11% | 0.05% | 4.18% | 3.52% | 6.31% | 2.57% | 57.78% |

***Max drawdown is approximately 5%, but can be set to individual requirements**

**Results listed are Non-Compounded averaged percentage rates of return, and are based purely on the percentage balance increase in the averaged accounts for that given month. Rates of return on individual accounts vary.*

**PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS**

*REGULATORY DISCLOSURE*
*Trading in the Foreign Exchange market involves a significant and substantial risk of loss and may not be suitable for everyone. You should carefully consider whether trading is suitable for you in light of your age, income, personal circumstances, trading knowledge, and financial resources. Only true discretionary income should be used for trading in the Foreign Exchange market. Any opinion, market analysis or other information of any kind contained in this document is subject to change at any time. Nothing in this document should be construed as a solicitation to trade in the Foreign Exchange market. If you are considering trading in the Foreign Exchange market before you trade make sure you understand how the spot market operates.*

Conundrum Capital LLC
A Charles Grégoire de Rothschild Group Company
New York – Miami – Lima – Frankfurt – London – Zurich

17076 Boca Club Boulevard, Suite 5 · Boca Raton, Florida 33487 · +1-561-998-2872 (Main) · +1-561-843-6622 (24 hrs)
www.conundrum-capital.com · info@conundrum-capital.com

COMPOSITE
PLAINTIFF'S EXHIBIT
LJ




## MANAGED ACCOUNT INVESTMENT PROGRAM – LOW YIELD

Trading Advisor: Conundrum Capital LLC

Program Name: Discretionary Capital Preservation

Primary Trade Location (s): Florida, New York, London, San Francisco Zurich, Panama, Frankfurt

Website: www.conundrum-capital.com

Marketing Contact: info@conundrum-capital.com +1-561-998-2872

Trading Location: Global Currency Markets

Trading Inception: January, 2010

Manager Trading Style: Customized Discretionary

Reporting Date: December, 2011

Current Availability: Accepting new ECP Qualified clients

## TRADING STRATEGY DESCRIPTION

Conundrum Capital is a systematic trading strategy which melds our proprietary internal signaling software (algorithms) with our live human-based trading team. Our focus is only in live currency trading (FX), with no derivative elements. All managed accounts are held on an individual basis, in the name of the client or entity. There is no co-mingling of client funds or accounts. Our program consists of multiple elements designed to limit client risk levels, while achieving consistent, robust, and stable investment returns. We normally focus on primary G-20 currency pairs, with an average holding period range from a few hours to four days. Our program itself consists of five co-operative yet independent strategies: a short-term / long-term volatility strategy, a short-term / mid-term following strategy, a short-term counter-trend VIX strategy, a risk analysis and capture strategy, and a trading-pair correlation strategy. These five strategies operate in parallel, providing indicated signals on trades, indicated signals on one or more trade series options, and overall trade optimizations for our live trading staff. All trades are hand-entered with a pre-determined target price, and are protected by a client-defined stop loss.

## AVERAGE PERFORMANCE – LOW YIELD PROGRAM

Discretionary Capital Preservation Trading (Signaled with Account Manager)

| | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | | | | | | | | | | | | | |
| 2011 | 6.85% | 5.22% | 5.54% | 4.35% | 5.60% | 1.9% | 4.16% | 0.56% | 8.32% | 3.12% | 2.65% | 0.61% | 48.88% |
| 2010 | 5.82% | 2.83% | 7.16% | 4.23% | 4.75% | 9.25% | 7.11% | 0.05% | 4.18% | 3.52% | 6.31% | 2.57% | 57.78% |

*Max drawdown is approximately 5%, but can be set to individual requirements

**Results listed are Non-Compounded averaged percentage rates of return, and are based purely on the percentage balance increase in the averaged accounts for that given month. Rates of return on individual accounts vary.*

**PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS**

*REGULATORY DISCLOSURE*
*Trading in the Foreign Exchange market involves a significant and substantial risk of loss and may not be suitable for everyone. You should carefully consider whether trading is suitable for you in light of your age, income, personal circumstances, trading knowledge, and financial resources. Only true discretionary income should be used for trading in the Foreign Exchange market. Any opinion, market analysis or other information of any kind contained in this document is subject to change at any time. Nothing in this document should be construed as a solicitation to trade in the Foreign Exchange market. If you are considering trading in the Foreign Exchange market before you trade make sure you understand how the spot market operates. United States customers must meet ECP qualifications to work with Conundrum Capital LLC.*

Conundrum Capital LLC
A Charles Grégoire de Rothschild Group Company
New York – Miami – Lima – Frankfurt – London – Zurich

17076 Boca Club Boulevard, Suite 5 - Boca Raton, Florida 33487 - +1-561-998-2872 (Main) - +1-561-843-6622 (24 hrs)
www.conundrum-capital.com - info@conundrum-capital.com




## MANAGED ACCOUNT INVESTMENT PROGRAM – LOW YIELD

| | | | |
|---|---|---|---|
| Trading Advisor: | Eagle International LLC | Trading Location: | Global Currency Markets |
| Program Name: | Discretionary Capital Preservation Trading | Trading Inception: | January, 2010* |
| Primary Trade Location (s): | New York, London, San Francisco, Sydney | Manager Trading Style: | Customized Discretionary |
| Website: | www.eagle-currency.com | | |
| Marketing Contact: | info@eagle-currency.com | Reporting Date: | September, 2013 |
| | | Current Availability: | Accepting new ECP Qualified clients |

## TRADING STRATEGY DESCRIPTION

Eagle International melds systematic trading strategy which melds our proprietary internal signaling software (algorithms) with our live human-based trading team. Our focus is only in live (spot) currency trading (FX), with no derivative elements. All managed accounts are held on an individual basis, in the name of the client or entity. There is no co-mingling of client funds or accounts. Our program consists of multiple elements designed to limit client risk levels, while achieving consistent, robust, and stable investment returns. We normally focus on primary G-20 currency pairs, with an average holding period range from a few hours to two weeks. Our program itself consists of five co-operative yet independent strategies: a short-term / long-term volatility strategy, a short-term / mid-term following strategy, a short-term counter-trend VIX strategy, a risk analysis and capture strategy, and a trading-pair correlation strategy. These five strategies operate in parallel, providing indicated signals on trades, indicated signals on one or more trade series options, and overall trade optimizations for our live trading staff. All trades are hand-entered with a pre-determined target price, and are protected by a client-defined stop loss. Eagle International is solely compensated on High-Water-Mark performance.

## AVERAGE PERFORMANCE – LOW YIELD PROGRAM

**Discretionary Capital Preservation Trading (Signaled with Account Manager)**

| | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2013 | 3.15% | 4.03% | 3.11% | 3.39% | 4.20% | -0.65% | 5.47% | 3.69% | 3.53% | | | | 29.89% |
| 2012 | 0.86% | NT* | 3.55% | 2.69% | 4.95% | 1.58% | 0.85% | 1.68% | 3.30% | 1.29% | 3.62% | 1.41% | 25.78% |
| 2011 | 6.85% | 5.22% | 5.54% | 4.35% | 5.60% | 1.9% | 4.16% | 0.56% | 8.32% | 3.12% | 2.65% | 0.61% | 48.88% |
| 2010 | 5.82% | 2.83% | 7.16% | 4.23% | 4.75% | 9.25% | 7.11% | 0.05% | 4.18% | 3.52% | 6.31% | 2.57% | 57.78% |

***Max drawdown is approximately 10% A/O July 2013 (previously approximately 5%), but can be set to individual requirements. NT=No Trades**

**Results listed are <u>Non-Compounded</u> averaged percentage rates of return, and are based purely on the percentage balance increase in the averaged accounts for that given month. Rates of return on individual accounts vary. NT = No Trade. Trading inception occurred under a previous firm partnership. Our current operations include the same systems, trading team, relative results and risk management controls.*

**PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS**

*REGULATORY DISCLOSURE*
*Trading in the Foreign Exchange market involves a significant and substantial risk of loss and may not be suitable for everyone. You should carefully consider whether trading is suitable for you in light of your age, income, personal circumstances, trading knowledge, and financial resources. Only true discretionary income should be used for trading in the Foreign Exchange market. Any opinion, market analysis or other information of any kind contained in this document is subject to change at any time. Nothing in this document should be construed as a solicitation to trade in the Foreign Exchange market. If you are considering trading in the Foreign Exchange market before you trade make sure you understand how the spot market operates.*
*<u>United States customers must meet ECP qualifications to work with Eagle International LLC.</u>*




301 Yamato Road, Suite 1240 - Boca Raton, Florida 33431
+1-561-994-6693 (Fax) +1-561-235-0889 (General Info)
info@eagle-currency.com




## MANAGED ACCOUNT INVESTMENT PROGRAM – LOW YIELD

Trading Advisor: Eagle International LLC

Program Name: Discretionary Capital Preservation Trading

Primary Trade Location (s): New York, London, San Francisco, Sydney

Website: www.eagle-currency.com

Marketing Contact: info@eagle-currency.com

Trading Location: Global Currency Markets

Trading Inception: January, 2010*

Manager Trading Style: Customized Discretionary

Reporting Date: October, 2013

Current Availability: Accepting new ECP Qualified clients

## TRADING STRATEGY DESCRIPTION

Eagle International melds systematic trading strategy which melds our proprietary internal signaling software (algorithms) with our live human-based trading team. Our focus is only in live (spot) currency trading (FX), with no derivative elements. All managed accounts are held on an individual basis, in the name of the client or entity. There is no co-mingling of client funds or accounts. Our program consists of multiple elements designed to limit client risk levels, while achieving consistent, robust, and stable investment returns. We normally focus on primary G-20 currency pairs, with an average holding period range from a few hours to two weeks. Our program itself consists of five co-operative yet independent strategies: a short-term / long-term volatility strategy, a short-term / mid-term following strategy, a short-term counter-trend VIX strategy, a risk analysis and capture strategy, and a trading-pair correlation strategy. These five strategies operate in parallel, providing indicated signals on trades, indicated signals on one or more trade series options, and overall trade optimizations for our live trading staff. All trades are hand-entered with a pre-determined target price, and are protected by a client-defined stop loss. Eagle International is solely compensated on High-Water-Mark performance.

## AVERAGE PERFORMANCE – LOW YIELD PROGRAM

**Discretionary Capital Preservation Trading (Signaled with Account Manager)**

| | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2013** | 3.15% | 4.03% | 3.11% | 3.39% | 4.20% | -0.65% | 5.47% | 3.69% | 3.53% | -4.98% | | | 24.90% |
| **2012** | 0.86% | NT* | 3.55% | 2.69% | 4.95% | 1.58% | 0.85% | 1.68% | 3.30% | 1.29% | 3.62% | 1.41% | 25.78% |
| **2011** | 6.85% | 5.22% | 5.54% | 4.35% | 5.60% | 1.9% | 4.16% | 0.56% | 8.32% | 3.12% | 2.65% | 0.61% | 48.88% |
| **2010** | 5.82% | 2.83% | 7.16% | 4.23% | 4.75% | 9.25% | 7.11% | 0.05% | 4.18% | 3.52% | 6.31% | 2.57% | 57.78% |

***Max drawdown is approximately 10% A/O July 2013 (previously approximately 5%), but can be set to individual requirements. NT=No Trades**

**Results listed are <u>Non-Compounded</u> averaged percentage rates of return, and are based purely on the percentage balance increase in the averaged accounts for that given month. Rates of return on individual accounts vary. NT = No Trade. Trading inception occurred under a previous firm partnership. Our current operations include the same systems, trading team, relative results and risk management controls.*

**PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS**

*REGULATORY DISCLOSURE*
*Trading in the Foreign Exchange market involves a significant and substantial risk of loss and may not be suitable for everyone. You should carefully consider whether trading is suitable for you in light of your age, income, personal circumstances, trading knowledge, and financial resources. Only true discretionary income should be used for trading in the Foreign Exchange market. Any opinion, market analysis or other information of any kind contained in this document is subject to change at any time. Nothing in this document should be construed as a solicitation to trade in the Foreign Exchange market. If you are considering trading in the Foreign Exchange market before you trade make sure you understand how the spot market operates.*
*<u>United States customers must meet ECP qualifications to work with Eagle International LLC</u>*




301 Yamato Road, Suite 1240 - Boca Raton, Florida 33431
+1-561-994-6693 (Fax) +1-561-235-0889 (General Info)
info@eagle-currency.com




## MANAGED ACCOUNT INVESTMENT PROGRAM – LOW YIELD

| | | | |
|---|---|---|---|
| Trading Advisor: | Eagle International LLC | Trading Location: | Global Currency Markets |
| Program Name: | Discretionary Capital Preservation Trading | Trading Inception: | January, 2010* |
| Primary Trade Location (s): | New York, London, San Francisco, Sydney | Manager Trading Style: | Customized Discretionary |
| Website: | www.eagle-currency.com | | |
| Marketing Contact: | info@eagle-currency.com | Reporting Date: | January, 2014 |
| | | Current Availability: | Accepting new ECP Qualified clients |

## TRADING STRATEGY DESCRIPTION

Eagle International melds systematic trading strategy which melds our proprietary internal signaling software (algorithms) with our live human-based trading team. Our focus is only in live (spot) currency trading (FX), with no derivative elements. All managed accounts are held on an individual basis, in the name of the client or entity. There is no co-mingling of client funds or accounts. Our program consists of multiple elements designed to limit client risk levels, while achieving consistent, robust, and stable investment returns. We normally focus on primary G-20 currency pairs, with an average holding period range from a few hours to two weeks. Our program itself consists of five co-operative yet independent strategies: a short-term / long-term volatility strategy, a short-term / mid-term following strategy, a short-term counter-trend VIX strategy, a risk analysis and capture strategy, and a trading-pair correlation strategy. These five strategies operate in parallel, providing indicated signals on trades, indicated signals on one or more trade series options, and overall trade optimizations for our live trading staff. All trades are hand-entered with a pre-determined target price, and are protected by a client-defined stop loss. Eagle International is solely compensated on High-Water-Mark performance.

## AVERAGE PERFORMANCE – LOW YIELD PROGRAM

**Discretionary Capital Preservation Trading (Signaled with Account Manager)**

| | Jan | Feb | Mar | Apr | May | Jun | July | Aug | Sept | Oct | Nov | Dec | Year |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **2014** | | | | | | | | | | | | | |
| **2013** | 3.15% | 4.03% | 3.11% | 3.39% | 4.20% | -0.65% | 5.47% | 3.69% | 3.53% | -4.98% | 0.97% | 5.13% | 31.00% |
| **2012** | 0.86% | NT* | 3.55% | 2.69% | 4.95% | 1.58% | 0.85% | 1.68% | 3.30% | 1.29% | 3.62% | 1.41% | 25.78% |
| **2011** | 6.85% | 5.22% | 5.54% | 4.35% | 5.60% | 1.9% | 4.16% | 0.56% | 8.32% | 3.12% | 2.65% | 0.61% | 48.88% |
| **2010** | 5.82% | 2.83% | 7.16% | 4.23% | 4.75% | 9.25% | 7.11% | 0.05% | 4.18% | 3.52% | 6.31% | 2.57% | 57.78% |

***Max drawdown is approximately 10% A/O July 2013 (previously approximately 5%), but can be set to individual requirements. NT=No Trades**

**Results listed are Non-Compounded averaged percentage rates of return on a gross basis, and are based purely on the percentage balance increase in the averaged accounts for that given month. Rates of return on individual accounts vary. NT = No Trade. Trading inception occurred under a previous firm partnership. Our current operations include the same systems, trading team, relative results and risk management controls.*

**PAST PERFORMANCE IS NOT INDICATIVE OF FUTURE RESULTS**

*REGULATORY DISCLOSURE*
*Trading in the Foreign Exchange market involves a significant and substantial risk of loss and may not be suitable for everyone. You should carefully consider whether trading is suitable for you in light of your age, income, personal circumstances, trading knowledge, and financial resources. Only true discretionary income should be used for trading in the Foreign Exchange market. Any opinion, market analysis or other information of any kind contained in this document is subject to change at any time. Nothing in this document should be construed as a solicitation to trade in the Foreign Exchange market. If you are considering trading in the Foreign Exchange market before you trade make sure you understand how the spot market operates.*
*United States customers must meet ECP qualifications to work with Eagle International LLC.*




301 Yamato Road, Suite 1240 - Boca Raton, Florida 33431
+1-561-994-6693 (Fax) +1-561-235-0889 (General Info)
info@eagle-currency.com

# EXHIBIT I

------Original Message------
To: J Jordan Serlin
To: J Jordan Serlin
To: J Jordan Serlin
Subject: Subpoenas+ Subpeonas 24. Monday am meeting all legal authoritess. Including Florida
Sent: Jan 20, 2012 5:34 PM

JOrdan

Please, answer the following questions at once.



1. When my fees wiring will arrived.

2. How much assets under management.

3. List clients since inception.

4. List clients currently.

5. Outstanding fees owed to GDR privee for each month since inception.

6. Did you divert any clients directly/ indirectly to any corporation owned by you or friendly relationship .

7. Financial statement 2010 + 2011.

8. Total legal bills since inception, which yu are personally liable.

9. When last time, Did you incorporate a company anywhere in the world, directly/ indirectly ownership.

10. Monthly overheads.

11. Cost platform+ how much you charged conundrumn, supply invoices.

12. Detailed names+ Amount assets " so call left since inception.

13. As agreed, do not recognize any amount superior $1000, which was agreed.

14. Auditing will occurred monthly by any chosen people/co by gdr.

15. Are you doing business with Deusche bank, if so I'm 50% on profits.

16. Copies all agreement Clients + Brokers+ Traders etc.

16. Are doing business + CM equities, Michael Kott.

17. List Clients embezzled, including

18. Will send Subpoenas to all suppliers + counterparts+ clients+ lawyers+ nfa + all members of your family.

19. Each dollar embezzled will multiply by the maximum allowed by law.

20. Total liaibilties

21. List any litigations pending as well.

22. Correspondences Deusche bank + contract directly or indirectly in your name or any company worldwide.

23. Correspondences CM equities + contracts directly or indirectly in your name or any company created worldwide.

24. Monthly rent.

Sent via BlackBerry from T-Mobile





------ SMS Text ------
To: +15618436622
Sent: Jan 27, 2012 1:06 PM
Subject: Kindly,

Kindly, jordan I want legal documented proof that everything is in order. This would include, checking the books + actual bank statements books + insurance + inovatrade + FQ clearing statements. Something isn't right and until I get this proof I will not be satisfied. Thanks+

Begin forwarded message:

**From:** "C. Gregoire de Rothschild" <gdr@gdrprivee.com>
**Date:** January 31, 2012 1:56:39 AM EST
**To:** <jordan@conundrum-capital.com>
**Subject: Urgent Resopnse**
**Reply-To:** "C. Gregoire de Rothschild" <gdr@gdrprivee.com>

Jordan,

Here is a list of items requested for review. Your behavior of not copying on emails and disclosing of business has has been very disappointing. Obviously you will be personally liable for this situation.

1.

1. Jordan Serlin (Jordan) must Disclose the name of the, "Company or Companies existing or to be created Worldwide" (CW), in which Jordan has assets under management.

2. Jordan, must provide the exact amount held in Panama.

3. Monthly since inception and in Panama Jordan must provide the current profit sharing amount due to GDR.

4. GDR is to receive all copies of NFA documentation.

5. Copies of all contracts of traders, brokers are to be provided to GDR.

6. A list of any assets, liabilities and litigations are to be provided to GDR.

7. Names of clients brought into Conundrum Capital through Jordan Serlin, Brokers, Traders, finders or any new sources directly, indirectly are to be provided to GDR.

8. Monthly reports will be provided on how much Conundrum Capital has made since the beginning including each month. This will include GDR and SFA, Jordan Serlin Family Participation.

9. All emails for NFA and Inovatrade, including legal matters are to be provided to GDR. All future emails are to be Blind Copied or forwarded to GDR.

10. Insurance will be provided and a copy of the insurance rider will be provided to GDR.

11. An independent accountant is to be pre-approved in writing and notarized by GDR.

12. K-1 or any tax and financial statements are to be provided to GDR for 2010 and 2011 and any future year and this for all CW.

13. Copy of clients halted agreement regarding halted trading due to accusations of fraud to be provided to GDR.

14. Copy statements for each client from FQ Securities and HSBC, and Commerzbank or any other



institution.

15. Copy of banks statement of CC including Bank United, MIG, Conundrum's bank in Panama or any other bank.

16. GDR &JS joint account to be traded immediately.

17. If the company has to be closed, Conundrum Capital must have GDR's written notarize permission. Dissolution of CC has to be approved by both members unanimously by Jordan and GDR by notarized authorization.

18. Copy of SFA family agreement regarding halted trading due to accusations of fraud to be provided to GDR.

19. Disclosure if the Traders are making fees off the Serlin Family Assets (SFA) account being paid out of the fee accounts.

20. Disclosure if the Traders are making fees off the all friends of SFA account introduced to Conundrum Capital by Mr. Serlin Sr. and are being paid out of the fee accounts.

21. Disclosure of any business Clifford Grossman or any person or entity may be representing Jordan's interest in CC or CW.

22. Written confirmation that Jordan is not doing business with FQA directly or indirectly through any other company, person or entity for currency trading and that there were no clients transferred by Jordan.

23. Written confirmation regarding any and all business directly or indirectly with Introductions including but not limited to L + L Capital Consulting, Dallas Lehman Broad.

24. All Clients met by any and all finders and introducing parties including but not limited to Jeff Miller, Lisa Levin, Denis Rivera, Dominika Zajak, Marten Kayle, Kimberly Klein, Ricardo Grados, Nan Wheterhorn, Fredrick Hoelbl, Javier Calvo, Robert Lai.

25. Disclosure if Jordan is doing business with any Conundrum Capital finders, Traders, Clients, since inception of CC also any Present and Potential Future.

26. Disclosure of all accounts that have self closed since inception.

27. Disclosure of all accounts that have closed since inception.

28. Disclosure of all accounts that have opened since inception.

29. Disclosure of all existing accounts.

30. Disclose a list of all Clients.

GDR

**From:** GDR google mail <gdr@gdrprivee.com>;
**To:** Gregoire de Rothschild <gdr@gdrprivee.com>;
**Subject:** Fw: URGENT" $1.110,000/ Per Day
**Sent:** Tue, Jun 3, 2014 12:56:03 AM

----- Forwarded Message -----
**From:** C. Gregoire de Rothschild <gdr@gdrprivee.com>
**To:** Jordan Serlin <jordan@conundrum-capital.com>; J Serlin <jordan@serlin.org>; Gregoire de Rothschild <gdr@gdrprivee.com>
**Sent:** Monday, February 13, 2012 5:05 PM
**Subject:** URGENT

Jordan,

I have continued to ask to look at Conundrum books, which are in my rights.

Since January 20th 2012 you have not complied, neither wiring money owed to GDR PRIVEE, and fees earned by GDR PRIVEE, but you had agreed to do so.

I Notify you that as mutually agreed, these are the following penalties to you personally and or jointly with Conundrum capital:

10k day or maximum allow per law, since January 20th 2012, until payment my investment $126,003.58.

$100k per day day or maximum allow per law,until payment my fees.

$1million per day day or maximum allow per law, until you respond to all questions sent to you several times.

GDR

----- Forwarded Message -----
**From:** C. Gregoire de Rothschild <gdr@gdrprivee.com>
**To:** "sserlin@nycap.rr.com" <sserlin@nycap.rr.com>
**Sent:** Sunday, June 30, 2013 4:15 PM
**Subject:** Fw: Another Jordan Lie: I Still awaiting Travelers Insurance Certificate

----- Forwarded Message -----
**From:** "gdr@gdrprivee.com" <gdr@gdrprivee.com>
**To:** J Jordan Serlin <jordan@conundrum-capital.com>
**Sent:** Thursday, February 16, 2012 10:05 PM
**Subject:** Travelers Insurance

Jordan

Still What waiting
Travelers insurance
Copies
+
Policy #

You have promised

GdR
Sent via BlackBerry from T-Mobile

# EXHIBIT J

**From:** "Jordan Serlin" <jordan@conundrum-capital.com>
**Date:** Thu, 9 Feb 2012 19:18:02 -0500
**To:** <mk@gdrprivee.com>
**Subject:** FW: Visit CPA

Marten,

There is absolutely no such provision as referred to below anywhere in the operating agreement or any amendments.

This review will be conducted as part of the dissolution by whomever the State independently appoints to do so.

The State Appointed Liquidating Trustee shall: "cause Financial Statements presenting such accounting to be prepared and certified."

---

**From:** C. Gregoire de Rothschild [mailto:gdr@gdrprivee.com]
**Sent:** Thursday, February 09, 2012 6:21 PM
**To:** Jordan Serlin
**Subject:** Visit CPA

Jordan,

Would like to schedule meeting

no later then next week by Certified Public Accountant

according to our agreement.

Please advise best day for you to make appointment.

Thank you



Best Regards

GDR

# EXHIBIT K

**From:** "Brian Aryai" <baryai@icongroupusa.com>
**Date:** Fri, 31 Jan 2014 19:35:43 -0500
**To:** <js@fordallen.com>; <Jordan@serlin.org>; <jordan@conundrum-capital.com>; <bSerlin@lmu.edu>; <toddserlin@aol.com>; <sms@serlin.org>; <sserlin@nycap.rr.com>
**Cc:** <gdr@gdrprivee.com>
**Subject:** Examination of Books & Records

VIA ELECTRONIC MAIL, FACSIMILE AND UNITED STATES MAIL

URGENT & TIME SENSITIVE

January 31, 2014

Mr. Jordan Serlin
Conundrum Capital LLC
17076-5 Boca Club Blvd.
Boca Raton, FL 33487

Dear Mr. Serlin:

Effective immediately, Icon Compliance Services LLC ("Icon") has been retained by GDR Privee Inc. ("GDR" or the "Client"), and Mr. Gregoire de Rothschild, to conduct an investigation of all financial transactions relevant to the operations of Conundrum Capital LLC ("Conundrum"). Icon will conduct a forensic accounting investigation in conjunction with GDR' counsel and accountants. Our objective is to thoroughly identify and evaluate all relevant financial transactions,





documents, data and facts related thereto, to determine compliance with the terms of Conundrum's Operating Agreement and applicable laws.

We have been instructed by the Client to disclose any violations of law discovered as a result of our investigation directly to appropriate law enforcement agencies as part of our representation of GDR. Icon is a leading global and licensed investigations firm which specializes in complex fraud investigations, forensic accounting, white-collar investigations, litigation support services and complex financial matters and disputes. Our professionals include former federal agents, certified public accountants, certified fraud examiners and attorneys.

Pursuant to the terms of the "Limited Liability Company Operating Agreement of Conundrum Capital LLC", dated June 10, 2010, we demand immediate access to Conundrum's books and records. Please respond to this communication by the close of business on February 7, 2014, to discuss arrangements for a detailed examination.

We look forward to working with you in a spirit of cooperation to consummate the mission of our engagement in our representation of GDR. I will be personally directing the investigation and, attached herewith, please find my biography. Additionally, I encourage you to visit our website at www.icongroupusa.com to familiarize yourself with the services of our firm. Please do not hesitate to contact me with any questions at my email address: baryai@icongroupusa.com.

Very truly yours,

**Brian S. Aryai, CPA, CFF, CIA, CFE**
**Chief Executive Officer**
**Icon Compliance Services, LLC**
**88 Froehlich Farm Blvd., 3rd Floor, Woodbury, New York 11797**
**470 3rd Street South, Suite 512, St. Petersburg, FL 33701**
**New York: (516) 808-3120**
**Florida: (727) 289-2982**
**baryai@icongroupusa.com**

# CON

## ICON COMPLIANCE SERVICES LLC

### BRIAN S. ARYAI, CPA, CIA, CFF, CFE

Brian Aryai serves as chief executive officer of Icon Compliance Services, LLC. Previously, he held positions as a senior corporate financial executive at four public international conglomerates. Aryai also served as a senior special agent at the United States Treasury Department for 14 years, where he conducted numerous white collar and corporate financial investigations both in criminal and civil matters. He received numerous awards for consistently superior performance in enforcing Federal laws.

After leaving the United States Government, Aryai served as a senior executive at several international conglomerates. He was also appointed as CPA partner in charge of the consulting practice at a regional accounting firm and a director of the antifraud practice at an international accounting firm. In these previous positions, Aryai concentrated in internal auditing, forensic accounting, internal and white-collar fraud and audit-committee investigations. These audits and investigations included both civil and criminal matters.

In 2009, Aryai accepted a contract appointment to provide specialized advisory project based expertise to the United States Department of Justice in governmental law enforcement matters and operations, where Aryai worked on the Madoff matter amongst other significant probes and asset forfeiture. Aryai's work has been widely publicized and resulted in numerous criminal prosecutions and convictions as well as successful civil litigation in many matters adjudicated in federal and state courts. Aryai also served as the controller and CFO of the New York office of Bovis Lend Lease (later named Lend Lease) and oversaw annual revenues of approximately $3 billion (USD). In that position he discovered, investigated and presented for successful prosecution the largest fraud scheme on record in the history of the construction industry worldwide.

Recently he has served on two long term sabbatical assignments. The first as a forensic financial consultant to the United States Department of Justice and the second as the Director of Investigations at a global non-profit organization which provided newly constructed housing to underprivileged families. In his career as a federal agent and in private practice, Aryai investigated, indicted and secured convictions on over three hundred complex criminal investigations, including but not limited to white collar fraud, racketeering, wire fraud, securities fraud, public corruption and money laundering, many of which have elicited acclaim on the front pages of national newspapers including the New York Times, the Wall Street Journal and the New York Daily News.

Finally, Aryai created Icon Compliance Services, LLC, a licensed investigations firm, providing forensic accounting, integrity monitoring, compliance consulting, internal audit, investigations, risk management, security consulting, corporate intelligence and counter-intelligence practices. Aryai holds the respected designations of Certified in Financial Forensics ("CFF"), Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFF") and Certified Internal Auditor ("CIA").

IRS Circular 230 Notice
In compliance with IRS requirements, we inform you that any U.S. federal, state or local tax advice contained in this communication is not intended or written to be used, and can not be used, for the purpose of avoiding tax penalties or in connection with marketing or promotional materials.
************************************************************
************************************************************
************************************************************
**********
The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. If you received this in error, please contact the sender and delete the material from any computer.

<14 0131 Retention Letter Executed.pdf

# EXHIBIT L

I m Iulian Bucur from Romania , Bucharesth in EU certified that I have stopped to do any business with Mr. Charles Gregoire de Rothschild, because of the sudden closure & the alleged embezzlement of about Two Hundred Million Dollar ($200 Million) by Jordan D. Serlin, president of Conundrum Capital, LLC. & owner successor Eagle International, LLC

After reading the courts documents, it's unbelievable & Shocked that the Courts system didn't do Justice for such Unjust behavior & UNJUST ENRICHMENT.

In Switzerland it could be very costly for the Defendant: Jail & stripped of all his stolen assets worldwide because in view of Jordan D. Serlin & his accomplices, including his family members' tactics.

After justice is done, then I will reconsidère my position.

Iulian Bucur

Witness : Dragos Dan Junescu

PLAINTIFF'S EXHIBIT

L

# EXHIBIT M




Dear Monsieur de Rothschild,
dear Grégoire,

after knowing you for over 20 years and having made only positive experiences with you personally and also on any business we have done in the past, I find it truly appalling what is going on between you and Mr. Serlin.

I must however inform you that as long as this issue is not resolved, I will have to take distance on any business matters that we may have or will have in the future.

Knowing you, I do trust that this „business" decision will have no effect on our personal relationship.

I am sure that this matter will be resolved quickly by the courts seeing that your reputation has always been one of a true gentleman.

I am wishing you the best of luck and looking forward in hearing and seeing you soon.

**With kind regards**

**Frederik de Badrihaye**
**CEO**

original signature approved

19.11.19

Peter Wagenaar

FDB INVEST Co.k.s, Stefanikova 7, 81106 Bratislava, Slovak Rep
WWW.FDBINVEST.COM office@fdbinvest.com +44 20 321 70 897

PLAINTIFF'S EXHIBIT

# EXHIBIT N

**schuurman**

**De:** schuurman [f.schuurman@sunrise.ch]
**Envoyé:** jeudi, 7 novembre 2019 21:53
**À:** 'GDR@GDRPrivee.com'
**Objet:** TR: Affidavit to witness immédiatly please

CDG commodities company
Mr. Fred Schuurman
100 route lac lussy,
1618 Chatel St Denis,
Switzerland

I Fred Schuurman, attest that I have stopped to do any business with Mr. Charles Gregoire de Rothschild, because of the sudden closure of Conundrum Capital, llc. & the alleged embezzlement of about Two Hundred Million Dollar ($200 Million) by Jordan D. Serlin & family & Associates.
president of conundrum Capital, LLC. & successor Eagle international, LLC
After reading the courts documents, it's unbelievable & Shocked that the Courts system didn't do Justice for such Unjust behavior & UNJUST ENRICHMENT. In Switzerland it could be very costly for the Defendant: Jail & stripped of all stolen assets worldwide. Also, Jordan D. Serlin & his accomplices, including his family members' tactics.

And the postings probably, made by Jordan D Serlin & family & accomplices, directly and or indirectly, to ruined Charles de Rothschild' credibility: to stop him to do business.

Once justice is done, then I will be ready to reconsidère our position
PS" Also, more importantly, because of this horrible situation, I myself lost credibility with clients.

3.11.2019. Fred Schuurman

Fred Schuurman.



# EXHIBIT O



# Animal Medicine & Surgery Clinic

9518 Avenue L
Brooklyn, NY 11236

Phone: 718-444-5151
Fax: 718-444-5406

Ronald J. Chaikin D.V.M.
George Vincent D.V.M.
Hooman Pooya D.V.M.

11-15-19

Dear Monsieur de Rothschild,
Dear Grégoire,

After knowing you for over 26 years and having had only positive experiences with you personally with regards to businesses we have done in the past, I find it truly heartbreaking with what is going on between you and Mr. Jordan D Serlin.

Due to this conflict, I must however inform you that as long as this issue is not resolved, I will have to take a leave on any business matters that we may have discussed or will have in the future.

Knowing you, I do trust that this business decision will have no effect on our personal relationship.

I am sure that this matter will be resolved quickly knowing that your reputation has always been one of a true gentleman.

I am wishing you the best of luck and looking forward in hearing and seeing from you in the future.

Best regards,

Dr. Ronald Chaikin

